UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - -x

SOCIETE DES BAINS DE MER ET DU
CERCLE DES ETRANGERS A
MONACO,

                Plaintiff,

    vs.

PLAYSHARE PLC, GRAND
MONACO LTD., GAMSHARE (UK)
LTD., LUCAN TOH, MAXWELL
WRIGHT, HILSTEAD LTD.,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - -x

:
:
:
:
:
:
:
:
:

Case No.  07 Civ. 4802 (DAB) (RLE)

ECF Filing


# MEMORANDUM OF LAW IN
## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 4

ARGUMENT ................................................................................................................... 7

I.  DEFENDANTS ARE SUBJECT TO PERSONAL JURISDICTION UNDER
    NEW YORK'S LONG-ARM STATUTE ............................................................... 8

    A.  Defendants Are Subject to Personal Jurisdiction Under CPLR § 302(a)(1) ........... 8

        1.  The Grand Monaco Casino Website, a Highly Interactive Website,
             Supports a Finding of Personal Jurisdiction Over Defendants ................... 9

        2.  Personal Jurisdiction Over Defendants Is Proper Because
             Defendants "Transact Business" With New Yorkers Through
             Their Affiliate Programs ........................................................................... 11

        3.  Personal Jurisdiction Over Defendants Is Proper Based on
             Defendants' Promotion of Their Gaming Services Within
             New York ................................................................................................. 13

    B.  Defendants Are Subject to Personal Jurisdiction Under § 302(a)(3)(ii) .............. 15

        1.  Defendants Have Committed Tortious Acts Which Cause SBM
             Injury Within New York ........................................................................... 15

        2.  Defendants Should Reasonably Expect Their Actions to Have
             Consequences in New York ...................................................................... 16

        3.  Defendants Derive Substantial Revenue From Interstate Commerce ....... 17

    C.  Toh, Wright, and PlayShare's Subsidiaries Are Subject to Personal
        Jurisdiction ........................................................................................................... 18

        1.  Wright and Toh Are Individually Subject to Personal Jurisdiction
             Based on Their Active and Knowing Causation of Trademark
             Infringement ............................................................................................. 18

        2.  PlayShare's Subsidiaries Are Subject to Personal Jurisdiction
             Based on Their Relationship to PlayShare ............................................... 20

    D.  Exercising Jurisdiction Over Defendants Comports With Due Process ............... 22

II.  SHOULD THE COURT FIND SBM HAS FAILED TO MAKE A *PRIMA FACIE*
    SHOWING OF PERSONAL JURISDICTION, SBM SHOULD BE GRANTED
    JURISDICTIONAL DISCOVERY ...................................................................... 23

CONCLUSION ............................................................................................................. 25

i

## TABLE OF AUTHORITIES

**Page**

### Cases

*Aerotel, Ltd. v. Sprint Corp.,*
  100 F. Supp. 2d 189 (S.D.N.Y. 2000) ...................................................25

*Alpha Int'l, Inc. v. T-Reproductions, Inc.,*
  No. 02 Civ. 9586 (SAS),
  2003 WL 21511957 (S.D.N.Y. July 1, 2003)...............................20, 23

*Am. Network, Inc. v. Access Am./Connect Atlanta, Inc.,*
  975 F. Supp. 494 (S.D.N.Y. 1997) ......................................................15

*Bensusan Restaurant Corp. v. King,*
  126 F.3d 25 (2d Cir. 1997) ...............................................................7, 8

*Best Van Lines, Inc. v. Walker,*
  490 F.3d 239 (2d Cir. 2007) ................................................................9

*Chew v. Dietrich,*
  143 F.3d 24 (2d Cir. 1998) ................................................................22

*Citigroup Inc. v. City Holding Co.,*
  97 F. Supp. 2d 549 (S.D.N.Y. 2000) .....................................8, 11, 15

*City of New York v. Cyco.Net, Inc.,*
  383 F. Supp. 2d 526 (S.D.N.Y. 2005) ..................................................8

*Drake v. Lab. Corp. of Am. Holdings,*
  No. 02-Civ-1924 (FB)(RML),
  2007 WL 776818 (E.D.N.Y. Mar. 13, 2007)....................................23

*Filus v. Lot Polish Airlines,*
  907 F.2d 1328 (2d Cir. 1990) ...........................................................23

*GTMF, Inc. v. Int'l Basic Source, Inc.,*
  No. 01 Civ. 6203 (RWS),
  2002 WL 31050840 (S.D.N.Y. Sept. 12, 2002) .............................18-19

*Gear, Inc. v. L.A. Gear Cal., Inc.,*
  637 F. Supp. 1323 (S.D.N.Y. 1986) ...................................................25

*Hsin Ten Enter. USA, Inc. v. Clark Enters.,*
  138 F. Supp. 2d 449 (S.D.N.Y. 2000) .............................8, 11, 22, 23

*ISI Brands, Inc. v. KCC Int'l, Inc.,*
   458 F. Supp. 2d 81 (E.D.N.Y. 2006) ................................................................................9

*Int'l Bancorp, LLC v. Société des Bains de Mer et du Cercle des Etrangers à Monaco,*
   329 F.3d 359 (4th Cir. 2003) ........................................................................................16

*Int'l Shoe Co. v. Washington,*
   326 U.S. 310 (1945) .....................................................................................................22

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.,*
   146 F.3d 66 (2d Cir. 1998) ...........................................................................................17

*Mattel, Inc. v. Adventure Apparel,*
   No. 00 Civ. 4085 (RWS),
   2001 WL 286728 (S.D.N.Y. Mar. 22, 2001)..................................................................8

*Mattel, Inc. v. Internet Dimensions Inc.,*
   No. 99 Civ. 10066(HB),
   2000 WL 973745 (S.D.N.Y. July 13, 2000)..................................................................18

*Mullaly v. Jones,*
   No. 2:05 CV 00154-BES-GWF,
   2007 WL 674294 (D. Nev. Feb. 28, 2007)......................................................................9

*New Angle Pet Prods., Inc. v. MacWillie's Golf Prods., Inc.,*
   No. 06-CV-1171 (DRH)(WDW),
   2007 WL 1871345 (E.D.N.Y. June 28, 2007)...............................................................11

*Obabueki v. Int'l Business Machines Corp.,*
   Nos. 99 Civ. 11262 (AGS), 99 Civ. 12486 (AGS),
   2001 WL 921172 (S.D.N.Y. Aug. 14, 2001).................................................9, 11, 21

*PDK Labs, Inc. v. Proactive Labs, Inc.,*
   325 F. Supp. 2d 176 (E.D.N.Y. 2004) ..........................................................................15

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,*
   No. 05-Civ-9016 (SAS),
   2006 WL 708470 (S.D.N.Y. Mar. 20, 2006).................................................................24

*Porina v. Marward Shipping Co., Ltd.,*
   No. 05 Civ. 5621(RPP),
   2006 WL 2465819 (S.D.N.Y. Aug. 24, 2006)...............................................................23

*Seldon v. Direct Response Tech., Inc.,*
   No. 03 CIV. 5381 (SAS),
   2004 WL 691222 (S.D.N.Y. Mar. 31, 2004)...................................................................9

*Smit v. Isiklar Holding A.S.*,
    354 F. Supp. 2d 260 (S.D.N.Y. 2005) ........................................................23

*Société des Bains de Mer et du Cercle des Etrangers à Monaco v. Empire Online, Ltd.*,
    Case No. 06 Civ. 4209 (DLC) (June 2, 2006) ...................................................16-17

*Uebler v. Boss Media, AB*,
    363 F. Supp. 2d 499 (E.D.N.Y. 2005) ..........................................................8, 9, 20

*Wafios Mach. Corp. v. Nucoil Indus. Co.*,
    No. 03-Civ-9865 (RWS),
    2004 WL 1627168 (S.D.N.Y. July 23, 2004).........................................................24

## STATUTES

CPLR § 302(a)(1) ....................................................................................passim

CPLR § 302(a)(3) ....................................................................................passim

Plaintiff Société des Bains de Mer et du Cercle des Etrangers à Monaco ("SBM") submits this memorandum of law in opposition to Defendants' Motion to Dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).

## PRELIMINARY STATEMENT

Defendants are clearly subject to personal jurisdiction in this Court. Through their ownership of at least sixty-six domain names incorporating the terms "Monaco Casino" or "Monaco," all of which infringe SBM's United States ("U.S.") trademark rights, Defendants continuously and regularly derive revenue from and interact with New Yorkers. First and foremost, New Yorkers can and undoubtedly do gamble in significant numbers on Defendants' Grand Monaco Casino website. New Yorkers can open an account and gamble on the Grand Monaco Casino website simply by using an out-of-state address—even an address as obviously inaccurate as that of the White House. Defendants' alleged restriction of New Yorkers is entirely "for the record" and lacks any substance whatsoever. That fact alone should give rise to jurisdiction over Defendants, who together control the website and its operations. But there is far more here. Defendants actively enroll New Yorkers in their affiliate programs with one express purpose in mind: enticing them to earn a "handsome income" through their promotion of the Grand Monaco Casino website, among others. Not only do Defendants target and derive substantial revenue from New York residents, they actually employ New Yorkers to assist them in so doing. Defendants admitted in a separate proceeding that 95% of traffic to their website is derived from affiliate links and undoubtedly many of these are New York-based (though Defendants provide no specific information about that here, notwithstanding that it is obviously relevant information). Defendants cannot—nor do they even attempt to—deny that New York affiliates, which are no doubt substantial in numbers, are triggering mechanisms through which consumers, including New Yorkers, access and interact with Defendants' Grand Monaco Casino website. Further, just last year Defendants gave away 8,000 gallons of gasoline to hundreds of

excited New Yorkers during their self-described "New York Gas Stunt" that they continue to tout publicly for its effectiveness as a marketing ploy.[1]

Defendants highlight their lack of physical presence in New York. Yet SBM has never contended that Defendants are subject to this Court's jurisdiction as a result of any offices, employees, or assets located in the state. Rather, it is quite clear from SBM's Complaint that it is the operation of Defendants' highly interactive website, the Grand Monaco Casino, that subjects them to this Court's jurisdiction, even without the abundant additional connections Defendants have with New York.

Because New York and other U. S. residents interacting with the Grand Monaco Casino website are likely to believe mistakenly that the website is sponsored or authorized by or affiliated with SBM, SBM is suffering irreparable reputational injury throughout the U.S. However, the impact of this injury is compounded in New York by the fact that for the past twenty years SBM's U.S.-based marketing efforts for its casino-related goods and services have been generated from New York City. Moreover, Defendants must stand trial somewhere in the U.S. for their tortious U.S. cybersquatting and trademark infringing activities and account to SBM for damages for such infringement. In light of SBM's continuous physical presence in New York, and Defendants' highly interactive website and undoubted roster of New York-based gamblers and affiliates, it would defy logic if this case were not to proceed here.

Defendants' Memorandum of Law and supporting Declaration of Maxwell Wright are replete with representations that are directly contradicted by publicly available information and by prior

---

[1]  Defendants dedicate a significant portion of their Memorandum in Support of Motion to Dismiss ("Def. Br.") to discussing trademark priority and SBM's use of its trademarks in commerce. The merits of these substantive trademark issues, however, are not relevant to the question of whether Defendants are subject to the personal jurisdiction of this Court and will be not be addressed here, but rather in due course.

statements made by Defendants in connection with related proceedings pending between the parties.[2]

They even make misrepresentations about their own identities and dealings. They contend that there

is no such entity as Grand Monaco Limited—repeatedly—yet a search on the Registrar of

Companies for England and Wales reveals that Grand Monaco Limited was incorporated as a private

limited company on March 6, 2007. As a listed Director of the company, their affiant Maxwell

Wright should have personal knowledge of this fact. In addition, Naden, Inc. is now the third entity

from which Defendants claim to have purchased the Grand Monaco Casino and associated domain

names in proceedings against SBM.[3] Defendants' attempt to depict themselves as separate and

distinct corporate entities and two individuals haled into court solely by virtue of their positions as

corporate officers is belied by their own websites and public representations. Despite Defendants'

conflicting representations, it is clear from the entire record that Defendants transact business and

have caused harm to SBM within New York through their operation of the Grand Monaco Casino

website. Should the Court have any doubt, SBM respectfully requests that it order basic discovery

concerning Defendants' New York-based activities, particularly in view of the contradictory pattern

of representations made in Defendants' sworn submissions.

---

[2] As noted in the Complaint, SBM, Lucan Toh ("Toh"), and Maxwell Wright ("Wright") were involved in a proceeding before the World Intellectual Property Organization ("WIPO"), in which Toh and Wright were ordered to transfer the domain names at issue here to SBM. (Amended Complaint, dated June 7, 2007, ("Compl.") ¶47, Ex. D; Affidavit of Michael Levick, sworn to August 24, 2007, ("Levick Aff."), Ex. 44.) Notwithstanding the earlier filing of this action, PlayShare PLC, Toh, and Wright later filed suit against SBM in the District Court of Arizona on July 19, 2007, seeking to resolve the identical claims raised here; namely, whether the use of the Monaco Domain Names amounted to cybersquatting and whether SBM's CASINO DE MONACO and CASINO DE MONTE-CARLO trademarks were valid and enforceable (the "Arizona Action"). (Levick Aff., Ex. 45.) SBM has also filed similar actions in the United Kingdom (the "UK Action") and France.

[3] Defendants identify a different party from which the Grand Monaco Casino was purchased with each pleading they submit. In connection with the WIPO proceeding, Defendants claimed to have purchased the Grand Monaco Casino through the acquisition of the Grand Gaming Group and the Monaco Domain Names from Wayne Smith, offering no explanation of the relationship between them. (Levick Aff., Ex. 42 at ¶¶3, 8.) In the UK Action, Defendants allege to have acquired the Grand Monaco Casino from Mountain Breeze Trust. (*Id.* Ex. 43 at ¶9.)

## STATEMENT OF FACTS

SBM is the founder and manager of five Monaco casinos, including the Casino de Monte-Carlo, which has been in operation since April 2, 1863. (Compl. ¶ 1.) Under express decree from the authorities of the Principauté of Monaco, SBM enjoys a monopoly for casino and gaming industries within the territory of the Principauté of Monaco and is therefore the sole company that can organize games and gambling in Monaco. (*Id.*) As a result of SBM's substantial investments spanning over more than a century, the terms "Monaco" and "Monte Carlo," when used in connection with casino-related goods and services, are famous in the U.S. and worldwide and embody a tremendous amount of goodwill inuring to SBM. (*Id.* ¶ 18.)

For approximately twenty years, SBM has maintained an office in New York City in conjunction with the Monaco tourism office to promote tourism in Monaco and advertise SBM's Monaco-based casinos to U.S. consumers. (*Id.* ¶ 23.) Through its New York office, SBM markets its casinos to U.S. consumers by participating in trade shows and arranging for advertising and marketing through various media. (*Id.* ¶ 24.) The New York office functions also as an international sales office for SBM, through which consumers are able to book reservations for travel to Monaco and make arrangements for use of SBM's Monaco-based casinos. (*Id.* ¶ 23.)

Defendants own and operate the Grand Monaco Casino, an online casino. (*Id.* ¶¶ 2, 30; Declaration of Maxwell Wright ("Wright Decl."), ¶ 3.) Defendant PlayShare PLC ("PlayShare") is the parent company of Defendants GamShare (UK) Limited ("GamShare") and Grand Monaco Limited ("Grand Monaco"). (Compl. ¶¶ 6-8.) All three companies share precisely the same registered office, located at 7 Queen Street, Mayfair, London W1J 5PB, UK. (*Id.*; Levick Aff., Ex. 5.) As noted above, although Defendants claim that Grand Monaco is not an actual entity, a Certificate of Incorporation—listing Defendant Wright as a Director—is available on the United Kingdom's official registrar. (Levick Aff., Ex. 1.) Defendants Wright and Toh are the registered

owners of the domain names incorporating the terms "Monaco Casino" or "Monaco" used in connection with the operation of the Grand Monaco Casino (the "Monaco Domain Names"). (Compl. ¶¶ 32-33; Wright Decl. ¶ 6.) Wright is the Chief Executive Officer of PlayShare, as well as a Director of PlayShare, GamShare, and Grand Monaco. (Compl. ¶ 10; Wright Decl. ¶ 1; Levick Aff., Exs. 1, 3-4.) According to Defendants, Toh was a Director of PlayShare, though he has resigned. (Wright Decl. ¶ 6.) Hillstead Limited ("Hillstead") handles financial transactions for the Grand Monaco Casino and other PlayShare gaming websites. (Compl. ¶ 11; Levick Aff., Ex. 24.) According to Hillstead's website, Hillstead is a subsidiary of the Grand Monaco Casino, although Defendants now contend otherwise. (Compl. ¶ 11; Levick Aff., Ex. 23; Wright Decl. ¶ 5.)

Defendants' representation that New York residents cannot access or gamble on the Grand Monaco Casino website is patently false. The Grand Monaco Casino website enables consumers, including those residing in New York, to download and install software and open an account through which to gamble on the website. (Compl. ¶ 28; Affidavit of Shawn Leonardi, sworn to August 23, 2007 ("Leonardi Aff."), ¶¶ 2, 4.) During the account registration process, users provide the Grand Monaco Casino with personal information, including their name, age, address, and email. (Leonardi Aff. ¶ 3.) Users can open a Guest Account, which allows them to gamble for free using virtual credits, or a Real Account, using real money. (*Id.* ¶ 2.) Although the Grand Monaco Casino website does not directly permit New York residents to open a Real Account, New Yorkers can easily circumvent this "restriction" simply by listing a non-New York address, even a blatantly questionable address, during the registration process. (*Id.* ¶ 4, Ex. A.) The Grand Monaco Casino directly permits New York residents to open a Guest Account. (*Id.* ¶ 6, Exs. D-E.) Consumers, including those based in New York, can communicate with Grand Monaco Casino representatives through a toll-free telephone number, email, and instant live chat. (Id. ¶¶ 5, 7, Exs. B-C; Levick

Aff., Exs. 13, 15.)  The Grand Monaco Casino emails consumers promotions, newsletters, and competition announcements.  (Levick Aff., Ex. 16.)

New Yorkers are the recipients of and invited to participate in Defendants' advertising and promotional ploys for their websites.  Defendants aggressively promote their Grand Monaco Casino, PokerShare, and CasinoShare gaming websites through affiliate programs, and approve prospective affiliates identifying themselves as residents of New York.[4]  (Compl. ¶¶ 29, 43-44; Leonardi Aff. ¶¶ 8-11, Exs. F, H, J.)  Through their PlayShare Affiliates and G3 Partner affiliate programs, Defendants license marketing materials, including banners, reviews, flash banners, emails, text links, and link codes, to affiliates, which surely include residents of New York, to promote their gaming websites.  (Compl. ¶ 44; Leonardi Aff. ¶¶ 9-10, 12, Exs. G-K.)  The G3 Partner website offers affiliates at least thirty varieties of these marketing materials for the Grand Monaco Casino. (Leonardi Aff. ¶ 12, Ex. K.)  Using these materials, affiliates link their websites and advertisements to Defendants' websites, allowing consumers to reach Defendants' Grand Monaco Casino website with the click of a button.  (Compl. ¶ 43; id. ¶¶ 9-12.)  Affiliates earn monthly revenues for money spent by players directed to Defendants' websites as a result of their efforts.  (Compl. ¶ 43; Leonardi Aff. ¶ 11; Levick Aff., Exs. 20-21.)  According to a submission filed by Wright in the WIPO matter, Defendants currently employ approximately 463 affiliates to promote their services and websites and attribute approximately 95% of individuals gambling on the Grand Monaco Casino website from affiliate activities.  (Compl. ¶ 43; Levick Aff., Ex. 42 at ¶¶ 4-5.)  Defendants provide no information

---

[4]  Prospective affiliates must provide Defendants with personal information, including their physical and email addresses.  (Leonardi Aff. ¶ 8, Ex. F.)  After reviewing and verifying each prospective affiliate's websites and information, Defendants alert applicants of the approval or denial via email.  (Id. ¶¶ 9-10, Exs. H, J.) Defendants also email New York affiliates updates and newsletters.  (Id. ¶ 13, Ex. L.)

as to whereabouts of their affiliates, which obviously suggests that they are located here in New York in not insignificant numbers.

Defendants have also targeted and specifically promoted their gambling websites and affiliate programs to New York City residents with a highly publicized "New York Gas Stunt." (Compl. ¶ 39; Levick Aff., Exs. 26-28.) The stunt, held last Memorial Day weekend—a weekend infamous for travel volume—provided New York City residents with over 8,000 gallons of gasoline free of charge. (Compl. ¶ 39; Levick Aff., Exs. 26-28.) Defendants' press release, issued in New York, quotes Defendant Toh as stating "we'll be back" in response to the premature shut down by the police due to traffic. (Levick Aff., Ex. 26.) Although Defendants did not own the Grand Monaco Casino at the time of the event, New Yorkers now familiar with Defendants' online casinos as a result of the event will undoubtedly be directed to the Grand Monaco Casino website. Defendants have made certain of this by bundling the marketing and promotion of the Grand Monaco Casino, PokerShare, and CasinoShare websites through their affiliate programs. Defendants continue to count the event among the marketing activities aimed to boost PlayShare to a Top 5 online gaming company within the next two years. (Levick Aff., Ex. 19.)

Defendants have also targeted New Yorkers specifically with promotional appearances of their attention-grabbing, poker-playing chimp, Mikey. Defendants widely publicize their sponsorship of Mikey, who has made several New York television and radio appearances. (*Id.*, Exs. 30-36.) As a direct result of Defendants' efforts, Mikey has become synonymous with Defendants' gambling services in the eyes of the public, including New Yorkers.

## **ARGUMENT**

A party is subject to personal jurisdiction in federal court if the party falls within the reach of the forum state's long-arm statute and if the exercise of jurisdiction comports with the constitutional requirements of due process. *See Bensusan Restaurant Corp. v. King*, 126 F.3d 25, 27 (2d Cir.

1997). At the early stages of a proceeding, where no evidentiary hearing has been held, a plaintiff need only make a *prima facie* showing of jurisdiction. *Hsin Ten Enter. USA, Inc. v. Clark Enters.*, 138 F. Supp. 2d 449, 451 (S.D.N.Y. 2000). In determining whether a plaintiff has made such a showing, the court must construe the complaint and any affidavits in the light most favorable to the plaintiff and resolve all doubts in the plaintiff's favor. *City of New York v. Cyco.Net, Inc.*, 383 F. Supp. 2d 526, 541 (S.D.N.Y. 2005); *Mattel, Inc. v. Adventure Apparel*, No. 00 Civ. 4085 (RWS), 2001 WL 286728, at *2 (S.D.N.Y. Mar. 22, 2001).

I.     DEFENDANTS ARE SUBJECT TO PERSONAL JURISDICTION UNDER NEW
       YORK'S LONG-ARM STATUTE

       A.     Defendants Are Subject to Personal Jurisdiction Under CPLR § 302(a)(1)

       Defendants' ongoing transaction of business within New York through their operation and promotion of the Grand Monaco Casino website subjects them to personal jurisdiction under New York's long-arm statute. Under Section 302(a)(1), "jurisdiction is established where the defendant has transacted business within the state, and the claim arises out of that activity." *Hsin Ten Enter.*, 138 F. Supp. 2d at 455. Courts consider the totality of the circumstances to determine whether a defendant has transacted business or engaged in some purposeful activity in New York. *Id.*; *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 564 (S.D.N.Y. 2000). "A single transaction of business <u>is</u> sufficient to give rise to jurisdiction under CPLR § 302(a)(1), even where the defendant never enters the state, if the claim arises out of the transaction." *Citigroup*, 97 F. Supp. 2d at 564 (emphasis added); *see also Uebler v. Boss Media, AB*, 363 F. Supp. 2d 499, 504 (E.D.N.Y. 2005) ("Transacting business requires only a minimal quantity of activity . . . .") (internal quotations omitted); *Mattel, Inc.*, 2001 WL 286728, at *3 (jurisdiction established by one commercial transaction through defendant's website). Defendants' online gambling services and affiliate

programs—both of which are available to New York residents—unquestionably constitute "transacting business" under New York's long-arm statute.[5]

    1.    <u>The Grand Monaco Casino Website, a Highly Interactive Website, Supports a Finding of Personal Jurisdiction Over Defendants</u>

Websites that permit the exchange of information between the operator and users, such as the Grand Monaco Casino, are considered "interactive" and support a finding of personal jurisdiction. *Uebler*, 363 F. Supp. 2d at 505-06 (online casino held highly interactive website, establishing personal jurisdiction over foreign operators); *Obabueki v. Int'l Business Machines Corp.*, Nos. 99 Civ. 11262 (AGS), 99 Civ. 12486 (AGS), 2001 WL 921172, at *3-4 (S.D.N.Y. Aug. 14, 2001) (website enabling customers to download application for subscription to defendant's services, obtain login and password, receive price estimates and sample reports, and communicate with customer service via email held interactive).

---

[5] Defendants' citation to case law regarding personal jurisdiction through internet contacts is misleading to say the least. Two of Defendants' cases, for example, are solely about posting a message on an internet message board resulting in a defamation claim. *Seldon v. Direct Response Tech., Inc.*, No. 03 Civ. 5381 (SAS), 2004 WL 691222 (S.D.N.Y. Mar. 31, 2004); *Best Van Lines, Inc. v. Walker*, 490 F.3d 239 (2d Cir. 2007). In neither case did the court find the relevant activity (posting a message on a website that anyone could view) to be highly interactive. In the instant case, however, the relevant activity is the specific commercial transactions being conducted through Defendants' websites. Defendants attempt to conceal this distinction by replacing the distinguishing language, *see* Def. Br. at 9 (quoting *Seldon*, 2004 WL 691222 at *4, but replacing the word "posting" with the bracketed term "[web site content]"), but both *Seldon* and *Best Van Lines* explicitly limit their analyses to defamation actions regarding internet message boards and thus have no bearing on the instant case.

In *ISI Brands, Inc. v. KCC Int'l, Inc.*, 458 F. Supp. 2d 81, 87 (E.D.N.Y. 2006), the plaintiff alleged only that the defendant "sells products nationally," not that any commercial activity took place in New York. Here, SBM alleges commercial activity specifically in New York, *see, e.g.*, Compl. ¶¶ 31, 39-40, and thus is consistent with *ISI Brands*. *ISI Brands*, 458 F. Supp. 2d at 88.

Finally, *Mullaly v. Jones*, No. 2:05-cv-00154-BES-GWF, 2007 WL 674294 (D. Nev. Feb. 28, 2007), is wholly inapposite to the instant case. Notwithstanding that much of Defendants' citation is to the portion of the opinion discussing general jurisdiction (which is not at issue here), the defendants in that case did not have any responsibility for or control over the licensee third-party gaming sites who offered gambling services; rather, the defendants merely linked to the licensees' gambling sites. Here, however, Defendants directly provide the commercial services at issue. Indeed, even the *Mullaly* court recognizes this distinction. *See id.* at *6 (citing cases distinguishing between where personal jurisdiction is based on defendant's own activity versus activities by third-party websites).

Defendants' Grand Monaco Casino website is highly interactive. Through the website, New York residents are able to open either a Guest Account or Real Account, through which they may gamble. (Leonardi Aff. ¶¶ 4-6.) Defendants' claim that the Grand Monaco Casino blocks access to New York consumers is palpably false. While the Grand Monaco Casino does not directly allow New Yorkers to open a Real Account, New York residents can easily circumvent this obstacle by simply registering with a non-New York address. (*Id.* ¶ 4, Ex. A.) The Grand Monaco Casino employs no authentication process that prohibits New York residents from registering for the website's gambling services by entering an out-of-state address.[6] (*Id.*) As savvy website operators, Defendants must be aware of this obvious loophole. Moreover, the ability of a New York resident to open an account using an address as recognizable as 1600 Pennsylvania Avenue, Washington, D.C.—the address of the White House—suggests that Defendants have adopted a "don't ask, don't tell" policy with respect to New Yorkers. (*Id.*)

New York consumers can directly open a Guest Account (*id.* ¶ 6), which is designed to draw players into the Grand Monaco Casino. At login and during play, Guest Users are encouraged to play for real money. (*Id.*) In addition, once a player's $1,000 of virtual credits have expired, the player must play with real money in order to continue gambling on the Grand Monaco Casino website. (Levick Aff., Ex. 11.) Defendants obviously created the Guest Account function in hopes that players would become "hooked" after experiencing what the Grand Monaco Casino has to offer.

New Yorkers are able to communicate with Grand Monaco Casino representatives "all day and night, every day of the year" by telephone, email, or live chat.[7] (*Id.*, Exs. 13-15; Leonardi Aff.

---

[6] Defendants' claim that the Grand Monaco Casino blocks New York-based IP addresses also appears to be baseless (Wright Decl. ¶ 3), as it is possible for a New York resident to register an account using an email address owned by a New Yorker through a New York-based computer and internet connection. (Leonardi Aff. ¶4.)

[7] All three of these means enable consumers to effortlessly communicate with Grand Monaco Casino representatives. Defendants provide toll-free numbers, allowing consumers to communicate with Grand Monaco (footnote continued)

¶¶ 5, 7, Exs. B-C.) Grand Monaco Casino representatives even provide New Yorkers with detailed directions as to how to deposit funds into their account in order to gamble on Defendants' website. (Leonardi Aff. ¶ 5, Exs. B-C.) Thus, Defendants actively facilitate New Yorkers' ability to gamble at the Grand Monaco Casino. In addition, Defendants initiate communication by emailing consumers promotions, newsletters, and competition announcements. (Levick Aff., Ex. 16.) Defendants encourage consumers to add the Grand Monaco Casino to their email contacts and provide consumers with instructions on how to do so for fifteen different email hosts and spam filters to ensure that their communications are received. (*Id.*)

Because the interactivity of the Grand Monaco Casino website is "significant and clearly commercial in nature," Defendants' operation of the website "rises to the level of transacting business required to confer jurisdiction under Section 302(a)(1)." *Obabueki*, 2001 WL 921172, at *4; *see New Angle Pet Prods., Inc. v. MacWillie's Golf Prods., Inc.*, No. 06-CV-1171 (DRH)(WDW), 2007 WL 1871345, at *3 (E.D.N.Y. June 28, 2007) (personal jurisdiction premised on interactive website allowing viewers to purchase products and provide personal contact information); *Hsin Ten Enter.*, 138 F. Supp. 2d at 456 (exercising jurisdiction where users could purchase products, download order form, download application to be an "independent affiliate," and communicate with representatives through email and online chat on website); *Citigroup*, 97 F. Supp. 2d at 565 (jurisdiction based on website where consumers could apply for loans, access application for submission by facsimile, and communicate with representative via email and live chat).

2.    <u>Personal Jurisdiction Over Defendants Is Proper Because Defendants "Transact Business" With New Yorkers Through Their Affiliate Programs</u>

---

Casino representatives free of charge. Customers, including those in New York, can conveniently email to the Grand Monaco Casino by filling out and submitting a form provided by Defendants. Through the live chat feature, which is accessible from New York, consumers receive a virtually instantaneous response to any questions they may have concerning their account. (Levick Aff., Exs. 13-15.)

Defendants spend much of their Motion belaboring the false claim that New Yorkers are denied access to the Grand Monaco Casino website, conveniently ignoring that they directly transact business with New Yorkers through their affiliate programs. Defendants not only promote the Grand Monaco Casino to and derive substantial revenues from New Yorkers, but they actively employ New York residents to assist in such efforts. (Leonardi Aff. ¶¶ 8-10, Exs. H, J.) Defendants do not contend that New York residents are not eligible to enroll in either PlayShare Affiliates or G3 Partner and there is no indication of such a bar on the Grand Monaco Casino or affiliate program websites. To the contrary, both PlayShare Affiliates and G3 Partner openly accept applicants providing a New York address. (*Id.*) As Wright has confirmed, Defendants derive the overwhelming majority of Grand Monaco Casino consumers and, in turn, revenues, from the efforts of their affiliates, a significant number of which are likely from New York.[8] (Levick Aff., Ex. 42 at ¶¶ 4-5.) New Yorkers' own websites and Internet activities are therefore triggering mechanisms for gambling on the Grand Monaco Casino website.

As Defendants expressly convey to affiliates, their "goal [ ] is to assist [the affiliate] in earning a handsome income off www.GrandMonaco.com, and to build a strong player base from which to earn revenue share for years to come." (Leonardi Aff. ¶ 10, Ex. J.) To facilitate the generation of revenue from the Grand Monaco Casino for both themselves and affiliates, including those based in New York, G3 Partner offers affiliates at least thirty banners, reviews, emails, and other marketing materials featuring the Grand Monaco Casino. (*Id.* ¶ 12, Ex. K.) Defendants also contact New York affiliates via email to alert them of new offers and updates concerning their gaming websites in order to continue to build their consumer base and attract new affiliates. (*Id.* ¶

---

[8] Defendants' apparent lack of quality control or base criteria in the approval process indicates that any New Yorker, regardless of gaming industry or marketing experience, can be an affiliate. (Leonardi Aff. ¶ 9.)

13, Ex. L.) Defendants' operation of the Grand Monaco Casino website and its attendant affiliate programs thus "rises to the level of transacting business," is clearly commercial in nature, and more than satisfies the substantial relationship or articulable nexus to SBM's claims required under the long-arm statute. Indeed, Defendants' operation and promotion of the Grand Monaco Casino website is the heart of this proceeding.

3.    Personal Jurisdiction Over Defendants Is Proper Based on Defendants' Promotion of Their Gaming Services Within New York

Jurisdiction over Defendants is appropriate for the additional reason that they have actively promoted their online gaming services in New York with the specific purpose of attracting New York residents to their websites. Defendants gave away over 8,000 gallons of free gasoline to hundreds of New Yorkers to promote their gaming websites. (Compl. ¶ 39; Levick Aff., Exs. 26-28.) Defendants' own account, memorialized in a press release issued in New York City, portrays the event as a massive success. (Levick Aff., Ex. 26.) Defendants intended to stage an even larger give away, but were shut down prematurely by police after generating the longest gas line in New York City this decade. (*Id.*) The stunt was a calculated ploy to target a substantial segment of Defendants' consumer base to achieve maximum results. It worked. Defendants' New York Gas Stunt is ranked among the top ten most successful marketing stunts by Entrepreneur Magazine. (*Id.*, Ex. 27.) Coverage by local news, Fox News, *The New York Times*, the *Washington Post*, and other media outlets, ultimately reached more than nine million people in New York and across the nation. (*Id.*)

Defendants also promote their gambling services in New York through media appearances by Mikey the Chimp. By sponsoring Mikey, Defendants enjoy a great deal of media attention and public recognition generated by this supposedly vastly popular and awe-inspiring poker-playing chimp. Defendants prominently feature Mikey on their websites, count Mikey among their

promotional efforts designed to catapult PlayShare to a Top 5 gaming company within the next two years, and maintain a website and blog through which Defendants "speak" through Mikey. (*Id.*, Exs. 17, 19, 29.)  By virtue of Defendants' marketing, Mikey is the "face" of Defendants' gaming services. (*Id.*, Ex. 29-30.)  Mikey kicked off his media tour in connection with the 2006 World Series of Poker—where he was slated to play in a seat purchased for him by Defendants—in New York, appearing on several New York-based television shows, including Good Morning America, FOX News, and CBS, and The WB11 Morning News (now known as The CW11 Morning News). (*Id.*, Exs. 30, 32-33, 35-36.)  Defendants, particularly through Toh and Wright, have capitalized on the poker tournament's refusal to allow Mikey to play, avowing to sponsor him in future tournaments. (*Id.*, Exs. 30-31.)  Mikey continues to promote his poker-playing skills in New York, appearing live on the April 17, 2007 broadcast of popular New York radio show Opie and Anthony. (*Id.*, Ex. 34.)

The New York Gas Stunt and Mikey the Chimp are directly related to Defendants' promotion of the Grand Monaco Casino, as is confirmed by Defendants' own websites and marketing efforts. In addition to its acquisition of G3 Partner, through which Defendants actively recruit affiliates to promote the Grand Monaco Casino on their behalf, Defendants attribute the results of their New York Gas Stunt and sponsorship of Mikey with moving PlayShare closer to its goal of becoming a Top 5 gaming company within the next two years. (*Id.*, Ex. 19.)  Moreover, because Defendants' affiliate programs promote the Grand Monaco Casino, PokerShare, and CasinoShare websites, a promotional stunt for one website constitutes a promotional stunt for all three websites. (Compl. ¶44; Leonardi Aff. ¶ 11; *id.*, Ex. 21.)

Defendants' operation of the interactive Grand Monaco Casino website and associated affiliate program, coupled with the active promotion of their online gaming services within New York, provide a sufficient basis for the exercise of personal jurisdiction under CPLR § 302(a)(1).

B.    Defendants Are Subject to Personal Jurisdiction Under § 302(a)(3)(ii)

Defendants are also subject to this Court's jurisdiction pursuant to CPLR § 302(a)(3)(ii). Under § 302(a)(3)(ii), the Court can exercise jurisdiction over a non-domiciliary who "commits a tortious act without the state causing injury to person or property within the state . . . if he . . . expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate . . . commerce." *PDK Labs, Inc. v. Proactive Labs, Inc.*, 325 F. Supp. 2d 176, 179 (E.D.N.Y. 2004); *see also Citigroup*, 97 F. Supp. 2d at 568.

1.    Defendants Have Committed Tortious Acts Which Cause SBM Injury Within New York

In trademark infringement cases, "injury within the state includes harm and threatened harm in the New York market resulting from actual or potential confusion and deception of New York Internet users." *PDK Labs, Inc.*, 325 F. Supp. 2d at 181; *see also Am. Network, Inc. v. Access Am./Connect Atlanta, Inc.*, 975 F. Supp. 494, 497 (S.D.N.Y. 1997) (same). New York residents interacting with Defendants' Grand Monaco Casino website are likely to believe mistakenly that the website is sponsored, licensed, or authorized by or affiliated, connected or otherwise associated with SBM. (Compl. ¶¶ 48-49.) Given SBM's continuous presence in New York for the past twenty years, it is difficult to imagine a forum in which SBM has stronger brand recognition and goodwill. (Compl. ¶¶ 23-24.) It is thus New York residents that are most likely to experience confusion or deception upon viewing Defendants' Grand Monaco Casino website. SBM suffers irreparable harm and reputational injury with each New Yorker who encounters the Grand Monaco Casino website. Accordingly, Defendants are causing injury to SBM within the State of New York, the impact of

which is most felt in this forum by SBM and consumers alike. *Citigroup*, 97 F. Supp. 2d at 568 (plaintiff's claim that actual and potential customers in New York were likely to be confused upon viewing and interacting with defendant's website satisfied injury requirement of § 302(a)(3)). Based on SBM's twenty-year presence in New York, this Court has an interest in adjudicating the matter.[9]

> 2. Defendants Should Reasonably Expect Their Actions to Have Consequences in New York

Defendants should have reasonably expected that their infringing activities would have consequences in New York. As discussed above, New York residents interact with the Grand Monaco Casino website as both gamblers and affiliates. Even if Defendants claim ignorance as to New Yorkers gambling at the Grand Monaco Casino—a claim that would be questionable at best, as Defendants are undoubtedly aware that registration for the website lacks any sort of authentication process—Defendants surely cannot claim ignorance with respect to New York affiliates. Defendants collect contact information, including addresses, for each affiliate during the application process and represent that such information is verified before approval is granted. (Leonardi Aff., ¶¶ 8-10, Exs. G, I.) Accordingly, Defendants have knowledge of each and every New York affiliate.

Defendants point to Wright's claimed lack of personal knowledge of SBM's presence in New York in an effort to shield themselves from jurisdiction pursuant to § 302(a)(3)(ii). (Def. Br. 15; Wright Decl. ¶ 7.) Yet what Wright claims to personally know or not know[10] does not change what Defendants reasonably *should have* known. SBM's operation of its New York office has not only been open and notorious, but is a matter of public record. *See Int'l Bancorp, LLC v. Société des*

---

[9]    Moreover, witnesses and evidence concerning confusion are undoubtedly located in New York City.

[10]    Based on the number of inconsistent statements made by Wright throughout the various proceedings between the parties, any statements set forth in his Declaration should not be relied upon. *See* PJI 1:22 ("If you find that any witness has wilfully testified falsely as to any material fact . . . the law permits you to disregard completely the entire testimony of that witness upon the principle that one who testifies falsely about one material fact is likely to testify falsely about everything.").

*Bains de Mer et du Cercle des Etrangers à Monaco*, 329 F.3d 359, 364-65 (4th Cir. 2003) (discussing SBM's presence in New York); *Société des Bains de Mer et du Cercle des Etrangers à Monaco v. Empire Online, Ltd.*, Case No. 06 Civ. 4209 (DLC) (June 2, 2006) (SBM's New York contacts set forth in its pleadings). Defendants' proclaimed 35 years of experience in the gaming industry further supports a conclusion that they reasonably should have expected their operation of the Grand Monaco Casino website to have consequences in New York. (Levick Aff., Exs. 7-8.) Defendants highlight that, to bring consumers the best online gambling site, they searched the casinos of Monaco, Las Vegas, and Atlantic City. (*Id.*, Ex. 7) Based on Defendants' exploration of both SBM's Monaco-based casinos, as well as casinos in the U.S., Defendants reasonably should have known that SBM's U.S.-based promotions are generated from New York. Finally, in light of Wright's admitted knowledge of SBM's Casino de Monte Carlo and the luster of the term "Monaco" when used in connection with casino-related goods and services (*Id.*, Ex. 42 at ¶¶ 11, 16), Defendants should have conducted a trademark clearance search or, at a minimum, investigated SBM's U.S. activities prior to purchasing the Monaco Domain Names and launching the Grand Monaco Casino website. *See Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 71 n.2 (2d Cir. 1998) (failure to conduct a full search must be evaluated in light of defendant's knowledge of another's possible use of a mark when determining bad faith). Lack of actual knowledge of SBM's long-standing New York activities on the part of Defendants is purely the result of willful blindness and does not defeat the reasonable expectation standard.

3.    Defendants Derive Substantial Revenue From Interstate Commerce

The final requirement of § 302(a)(3)(ii), substantial revenue from interstate commerce, is also easily met. Despite Defendants' attempt to convince this Court otherwise, SBM alleged that Defendants derive substantial revenue from the Grand Monaco Casino website in its Complaint. (Compl. ¶¶ 31, 40, 45.) The Grand Monaco Casino is one of the largest online casinos in the world

(*Id.* ¶ 31; Levick Aff., Ex. 7), and is marketed and accessible to U.S. consumers—traditionally the strongest online gaming market.[11]   (Leonardi Aff. ¶¶ 4, 6, 8, 12; Levick Aff., Exs. 21-22.)

Accordingly, because Defendants' acts of trademark infringement and cybersquatting have caused injury to SBM within New York, Defendants should have reasonably expected such consequence to be felt in New York, and Defendants derive substantial revenue from interstate commerce, the Court may exercise personal jurisdiction over Defendants under § 302(a)(3)(ii).

C.   Toh, Wright, and PlayShare's Subsidiaries Are Subject to Personal Jurisdiction

This Court's exercise of personal jurisdiction over Defendants Wright and Toh and PlayShare's subsidiaries is wholly appropriate based on the operation of the Grand Monaco Casino website.

1.   Wright and Toh Are Individually Subject to Personal Jurisdiction Based on Their Active and Knowing Causation of Trademark Infringement

Wright and Toh are the registered owners of the sixty-six Monaco Domain Names at issue in this proceeding.   Wright is a Director of PlayShare, GamShare, and Grand Monaco, as well as the Chief Operating Officer of PlayShare.   (Wright Decl. ¶ 1; Compl. ¶ 10; Levick Aff., Exs. 1, 3-4.) Toh was a Director of PlayShare at the time it acquired the Monaco Domain Names, but has since resigned.   (Wright Decl. ¶ 6.)   It is well established that "a corporate officer who directs, controls, ratifies, participates in, or is the moving force behind the infringing activity, is personally liable for such infringement without regard to piercing of the corporate veil."   *Mattel, Inc. v. Internet Dimensions Inc.*, No. 99 Civ. 10066 (HB), 2000 WL 973745, at *9 (S.D.N.Y. July 13, 2000) (emphasis in original); *see also GTMF, Inc. v. Int'l Basic Source, Inc.*, No. 01 Civ. 6203 (RWS),

---

[11] As a means of comparison, Empire Online, Ltd., an online gambling company and competitor of PlayShare named as a defendant in a similar suit filed by SBM in this district approximately one year ago, reported that the U.S. made up 65% of its total revenues. (Levick Aff., Ex. 47.)

2002 WL 31050840, at *6 (S.D.N.Y. Sept. 12, 2002) (motion to dismiss claim against corporate director denied where plaintiff alleged officer was responsible for trademark infringement). This rule plainly encompasses Wright and Toh.

As the registered owners of the Monaco Domain Names, both Wright and Toh "actively and knowingly caused the trademark infringement, [and are] personally responsible." *Internet Dimensions Inc.*, 2000 WL 973745, at *9. In their capacities of Directors of PlayShare, Wright and Toh orchestrated the purchase of the Grand Monaco Casino and associated Monaco Domain Names.[12] The Monaco Domain Names registered and owned by Wright and Toh are essential to Defendants' operation of the Grand Monaco Casino. Moreover, Wright and Toh have personally promoted and marketed the Grand Monaco Casino website, as well as Defendants' "New York Gas Stunt" and Mikey the Chimp. (Levick Aff., Exs. 26, 28, 30-31.) Toh is quoted at length about the success of the "New York Gas Stunt" as a marketing device, stating in the face of the termination of the promotion by police, "we'll be back." (*Id.*, Ex. 26.) True to Toh's words, Defendants are indeed "back" in New York. Actually, they never left New York. Because Wright and Toh have "direct[ed], control[led], ratifie[d], participate[d] in, [and are] the moving force behind the infringing activity," namely Defendants' operation and promotion of the Grand Monaco Casino, they are both personally responsible for such infringement. *Internet Dimensions Inc.*, 2000 WL 973745, at *9.

Any doubt as to the propriety of such a conclusion is dispelled by Wright's and Toh's own admission in the Arizona proceeding. Not only have Wright and Toh, along with PlayShare, asked for declaratory judgment that their use of the Monaco Domain Names does not constitute cybersquatting, thereby entitling them to continue using the Monaco Domain Names, but they acknowledge that they are the "real parties in interest." (Levick Aff., Ex. 46 at 3 n.1.) Wright and

Toh cannot seek rights to use the Monaco Domain Names in one action while simultaneously attempting to avoid liability for such use in another action. (Def. Br. at 11.)

2.    PlayShare's Subsidiaries Are Subject to Personal Jurisdiction Based on Their Relationship to PlayShare

PlayShare subsidiaries GamShare, Grand Monaco, and Hillstead are also subject to this Court's jurisdiction, as all three function as mere departments or alter egos of PlayShare. *Uebler*, 363 F. Supp. 2d at 506 ("When the activities of a parent corporation show a disregard for the separate corporate existence of the subsidiary, New York law allows jurisdiction to be asserted over the subsidiary."); *Alpha Int'l, Inc. v. T-Reproductions, Inc.*, No. 02 Civ. 9586 (SAS), 2003 WL 21511957, at * 4 (S.D.N.Y. July 1, 2003) (parent's actions will provide grounds for jurisdiction over subsidiary where the subsidiary is a "mere department" of parent). The factors considered in the determination of whether a subsidiary is a "mere department" of its parent are: (1) common ownership, (2) financial dependency of the subsidiary on the parent, (3) the degree to which the parent interferes with the subsidiary's executive personnel and fails to observe corporate formalities, and (4) the parent's control of the subsidiary's marketing and operational policies. *Alpha Int'l*, 2003 WL 21511957, at * 4. Other factors that may be considered are common offices, common officers, books and accounts, and business departments. *Id.*

Here, PlayShare is the direct owner of both GamShare and Grand Monaco. (Compl. ¶¶ 6-8.) PlayShare, GamShare, and Grand Monaco have the same registered office and Wright is a Director of all three. (Levick Aff., Exs. 1, 3-5.) Grand Monaco's second Director is also a Director of PlayShare. (*Id.*, Exs. 1, 3.) GamShare has two Directors in addition to Wright, one of which is also a Director of PlayShare. (*Id.*, Ex. 3-4.) All three entities share the same corporate secretary. (*Id.*,

---

[12]  In his Statement submitted to WIPO, Wright personally takes credit for the decision to acquire the Grand Monaco Casino and G3 Partner. (Levick Aff., Ex. 42 at ¶ 3.)

Exs. 1, 3-4.) The PlayShare and PlayShare Affiliates websites represent that PlayShare owns and operates CasinoShare and PokerShare websites (*id.*, Exs. 17-18), whereas both gaming websites represent, and Defendants now seem contend, to be operated by GamShare.[13]  (*Id.*, Ex. 23.) Moreover, the PlayShare Affiliates website states that PlayShare is a subsidiary of GamShare. (*Id.*, Ex. 19.) It is impossible, based on Defendants' conflicting representations, to decipher which entity controls these websites or identify any sort of meaningful corporate divide. It is clear, however, that the business activities of all three entities are intertwined, as Defendants' affiliate programs encompass the Grand Monaco Casino, PokerShare, and CasinoShare websites. In addition, PlayShare promises to offer "a single wallet across all PlayShare brands." (*Id.*) The common ownership, officers, and offices, and substantial overlap in the marketing and operation of Defendants' gaming websites, indicate that GamShare and Grand Monaco are mere departments or alter egos of PlayShare. *See Obabueki*, 2001 WL 921172, at *5.

Although Defendants now contend that Hillstead is a subsidiary of Naden, Inc., Hillstead's website states that it is a subsidiary of the Grand Monaco Casino. (Levick Aff., Ex. 24.) This relationship is further confirmed by the fact that Wright is the registered owner of the Hillstead domain name, <www.hilstead.com>. (*Id.*, Ex. 25.) However, consistent with Defendants' apparent practice of inconsistency, the Grand Monaco Casino website represents: "Grand Monaco is a Hillstead Limited, Gibraltar site - now a member of the PlayShare group." (*Id.*, Ex. 6.) At this stage

---

[13]   Even here, Defendants seem to use PlayShare and GamShare interchangeably when discussing the New York Gas Stunt. *Compare* Def. Br. at 5 (gas stunt "designed to promote PlayShare's 'PokerShare' service"); Wright Decl. ¶ 4 (gas stunt "conducted to promote our entirely separate PokerShare.com on-line casino"), *with* Def. Br. at 10 (stunt staged by GamShare); Wright Decl. ¶ 4 (PokerShare and CasinoShare websites operated by GamShare).

of the proceeding, SBM has satisfied its burden of making a *prima facie* showing that GamShare, Grand Monaco, and Hillstead are mere departments or alter egos of PlayShare.[14]

    D.    <u>Exercising Jurisdiction Over Defendants Comports With Due Process</u>

    This Court's exercise of personal jurisdiction over all Defendants in this action comports with due process because each has "certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *see also Chew v. Dietrich*, 143 F.3d 24, 28 (2d Cir. 1998); *Hsin Ten Enter.*, 138 F. Supp. 2d at 457. To establish the minimum contacts sufficient to justify specific jurisdiction, the plaintiff must establish (1) that its "claim arises out of or relates to [defendant's] contact with [the forum state]," and (2) "that [the defendant] 'purposefully availed' [himself] of the privilege of doing business in [the forum state] and that [the defendant] could foresee being 'haled into court' there." *Chew*, 143 F.3d at 28 (alterations in original).

    Here, Defendants have purposefully availed themselves of the privilege of doing business in New York by maintaining an interactive website through which New York residents can gamble and actively enrolling New Yorkers in their affiliate programs. While Defendants do not directly permit New Yorkers to open a Real Account, Defendants—web-savvy and experienced online casino operators—undoubtedly know that New Yorkers are evading this "restriction" by simply using an out-of-state address. (Leonardi Aff. ¶ 4.) Defendants' failure to impose any type of authentication or verification process to prevent such conduct—particularly when Defendants have approved accounts for individuals clearly providing false information—suggests that Defendants willfully turn a blind eye to the continued gambling by New Yorkers on the Grand Monaco Casino website. (*Id.*)

---

[14] In the event that the Court is not satisfied with this showing, SBM should be granted jurisdictional discovery on the issue, as discussed in greater detail *infra* Section II.

Defendants directly permit New Yorkers to gamble on the Grand Monaco Casino website using a Guest Account and to participate in their affiliate programs. (*Id.* ¶¶ 6, 8-10.) Defendants regularly communicate with New York residents through telephone, email, and live chat. (*Id.* ¶¶ 5, 7, 13, Exs. B-C, L.) In addition, Defendants continue to tout the success of their New York Gas Stunt and sponsorship of Mikey the Chimp—who has made several promotional appearances in New York. (Levick Aff., Exs. 19, 30, 32-33.) Because Defendants have purposefully availed themselves of the privilege of conducting business in New York and should have reasonably anticipated being sued here, exercising jurisdiction comports with due process. *Alpha Int'l*, 2003 WL 21511957, at *5 (due process met by virtue of defendant's business activities in New York, including those conducted through defendant's interactive website); *Hsin Ten Enter.*, 138 F. Supp. 2d at 457 (same).

II.    SHOULD THE COURT FIND SBM HAS FAILED TO MAKE A *PRIMA FACIE* SHOWING OF PERSONAL JURISDICTION, SBM SHOULD BE GRANTED JURISDICTIONAL DISCOVERY

In the event that the Court finds that SBM has failed to establish a *prima facie* showing of personal jurisdiction over Defendants, SBM should be granted jurisdictional discovery on this issue. The Second Circuit has instructed that plaintiffs may be permitted jurisdictional discovery upon a showing of "a reasonable basis for assuming jurisdiction." *Filus v. Lot Polish Airlines*, 907 F.2d 1328, 1332 (2d Cir. 1990). Courts have broad discretion to order such discovery. *Porina v. Marward Shipping Co., Ltd.*, No. 05 Civ. 5621 (RPP), 2006 WL 2465819 (S.D.N.Y. Aug. 24, 2006).

Indeed, "district courts within the Second Circuit have ordered jurisdictional discovery where the plaintiff made less than a *prima facie* showing, but made a sufficient start toward establishing personal jurisdiction." *Drake v. Lab. Corp. of Am. Holdings*, No. 02-Civ-1924 (FB)(RML), 2007 WL 776818, at *9 (E.D.N.Y. Mar. 13, 2007) (slip op.) (internal quotations omitted); *see also Smit v. Isiklar Holding A.S.*, 354 F. Supp. 2d 260, 263 (S.D.N.Y. 2005) ("[I]f plaintiff has not pleaded a *prima facie* showing of personal jurisdiction, a court may order limited discovery targeted at the

missing jurisdictional elements if plaintiff has shown that such an exercise would serve <u>to fill any</u> <u>holes</u> in its showing.") (quotation marks and citation omitted) (emphasis in original). The Southern District recently confirmed that jurisdictional discovery "<u>should</u> be granted where pertinent facts bearing on the question of jurisdiction are controverted . . . or where a more satisfactory showing of the facts is necessary." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, No. 05-Civ-9016 (SAS), 2006 WL 708470, at *6 (S.D.N.Y. Mar. 20, 2006) (internal quotation marks omitted) (emphasis added); *see also Wafios Mach. Corp. v. Nucoil Indus. Co.*, No. 03 Civ. 9865 (RWS), 2004 WL 1627168, at *5 (S.D.N.Y. July 21, 2004) (same).

SBM has presented a reasonable basis for jurisdiction, showing that limited discovery is likely to uncover additional facts supporting personal jurisdiction over Defendants; SBM therefore should be granted jurisdictional discovery to obtain facts necessary to "fill in any holes" and confirm Defendants' contacts with this forum. For example, SBM reasonably believes (and, we submit, has demonstrated satisfactorily) that Defendants: (1) are aware of New York residents engaging in their services, both as gamblers and as affiliates; (2) derive significant revenue from interstate commerce, as well as from New York residents; and (3) specifically target New York residents with advertisements and promotions—beliefs that can be even further elucidated through limited discovery. Defendants' tendency to provide inconsistent representations throughout the various proceedings pending between the parties, as discussed above, further establishes the need for depositions, where SBM can uncover additional facts through direct questioning.

Jurisdictional discovery is also warranted to enable the Court to ascertain whether the PlayShare subsidiaries GamShare, Grand Monaco, and Hillstead are in fact "mere departments " or alter egos of PlayShare. When a plaintiff has alleged (even in a conclusory fashion) that a subsidiary corporation is a "mere department" of the parent corporation, jurisdictional discovery is proper to

ascertain "the precise level of interrelatedness between [parent and subsidiary]." *Aerotel, Ltd. v. Sprint Corp.*, 100 F. Supp. 2d 189, 194 (S.D.N.Y. 2000); *see also Gear, Inc. v. L.A. Gear Cal., Inc.*, 637 F. Supp. 1323, 1328-29 (S.D.N.Y. 1986) (granting jurisdictional discovery when "[d]efendants are interrelated" but the "actual relationship among the defendants [is] something of a mystery"). Finally, SBM should be granted discovery to determine Wright's and Toh's personal liability.

Thus, solely in the event that this Court should find that SBM failed to make a *prima facie* showing of personal jurisdiction, SBM seeks limited discovery in the form annexed to these papers, concerning Defendants' contacts with New York and their relationships. (Levick Aff., Exs. 48-49.)

## CONCLUSION

Based on the foregoing, SBM respectfully requests that Defendants' Motion to Dismiss based on lack of personal jurisdiction be denied. In the alternative, SBM requests discovery limited to jurisdictional issues.

DATED:  New York, New York
        August 24, 2007

QUINN EMANUEL URQUHART OLIVER &
HEDGES, LLP


By: _____
    Robert L. Raskopf (RR-5022)
    Lori E. Weiss (LW-7866)

51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel:  (212) 849-7000
Fax:  (212) 849-7100

ATTORNEYS FOR SOCIETE DES BAINS
DE MER ET DU CERCLE DES
ETRANGERS A MONACO

*Of Counsel*:

QUINN EMANUEL URQUHART OLIVER
& HEDGES, LLP

George R. Hedges
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Tel:  (213) 443-3000
Fax:  (213) 443-3100