UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - -x

SOCIETE DES BAINS DE MER ET DU
CERCLE DES ETRANGERS A
MONACO,

              Plaintiff,

      vs.

PLAYSHARE PLC, GRAND
MONACO LTD., GAMSHARE (UK)
LTD., LUCAN TOH, MAXWELL
WRIGHT, HILLSTEAD LTD.,

           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - -x

**ECF Case**

Case No.  07 Civ. 4802 (DAB)

**DEMAND FOR JURY TRIAL**



FEB 1 4 2008

U.S.D.C. S.D. N.Y.
CASHIERS

## SECOND AMENDED COMPLAINT

Plaintiff Société des Bains de Mer et du Cercle des Etrangers à Monaco ("SBM" or

"Plaintiff"), by its attorneys Quinn Emanuel Urquhart Oliver & Hedges LLP, for its Second

Amended Complaint against Defendants PlayShare PLC, Grand Monaco Ltd., GamShare (UK)

Ltd., Lucan Toh, Maxwell Wright, and Hillstead Ltd. (collectively, "Defendants"), alleges as

follows:

### PRELIMINARY STATEMENT

1.    This action arises from Defendants' attempt to attract customers to its gambling

websites by willfully and blatantly trading off the goodwill associated with the world-renowned

Monaco casinos that SBM has developed through enormous effort and financial investment over

a time period spanning more than a century.  SBM is the founder and manager of five Monaco

casinos, including the Casino de Monte-Carlo, which has been in operation since April 2, 1863.

Under express decree from the authorities of the Principauté of Monaco, SBM enjoys a

monopoly for casino and gaming industries within the territory of the Principauté of Monaco and

is therefore the sole company that can organize games and gambling in Monaco. As a result of

SBM's efforts spanning over more than a century, the Casino de Monte-Carlo — the oldest of

the five casinos owned and operated by SBM in Monaco — is famous and widely known as one

of the preeminent casinos in the world. SBM actively promotes its five Monaco-based casinos,

particularly the Casino de Monte-Carlo, in many countries throughout the world and in the

United States. Due to SBM's substantial investments, consumers perceive the terms "Monaco"

or "Monte Carlo" in connection with casino services as identifiers of casino owner-operator

SBM and the Principauté of Monaco. Indeed, the print and broadcast media, the film industry

and the general public have used the terms "Casino de Monte-Carlo" and "Casino de Monaco"

millions of times when referring to SBM's casinos.

　　　　2.　　　Notwithstanding these facts, and undeniably because of them, Defendants have

attempted to trade upon the enormous goodwill and brand equity associated with SBM's casinos

by registering and using at least 100 domain names that employ the term "Monaco," or variations

thereof, to operate gambling-related websites. At the commencement of the instant legal action

and for a period of time before that, Defendants' Grand Monaco Casino websites (the "Grand

Monaco Casino") and its gambling software — which could be downloaded free of charge —

prominently featured the designations GRAND MONACO CASINO and GRAND MONACO.

Defendants' GRAND MONACO CASINO and GRAND MONACO designations undoubtedly

cause consumers to mistakenly believe SBM sponsors, endorses, or is affiliated with Defendants'

websites. Moreover, Defendants' incorporation of the term "Grand" and a "crest" design in

connection with the term "Monaco"—both of which have connotations of royalty—further

exacerbates the likelihood for consumer confusion.

3.　　Following the filing of this action on June 6, 2007, Defendants rebranded and relaunched their Grand Monaco Casino as the Grand Mondial Casino. Defendants' "rebranding" entailed nothing more than the changing of "aco" to "dial." Such a trivial change does not dispel the likelihood that consumers will mistakenly believe that Defendants' websites are sponsored or endorsed by, or affiliated with SBM. Similar to the GRAND MONACO designation, the GRAND MONDIAL designation incorporates a "crest" and the website alerts consumers that it is the casino originally launched as Grand Monaco. Defendants continue to use domain names incorporating the term "Monaco" in connection with the "rebranded" websites. It is apparent that Defendants "rebranded" the Grand Monaco Casino websites with a careful eye towards retaining the customer base generated as a result of their wrongful use of the Grand Monaco identifier.[1] The minimal changes to Defendants' Grand Monaco Casino will undoubtedly be overlooked by consumers searching for the Grand Monaco Casino websites with which they have become familiar. As a result of Defendants' calculated efforts, consumer confusion exists now, just as it had prior to the "rebranding."

4.　　Defendants have deliberately infringed and diluted SBM's invaluable rights in its trademarks and brand equity through the registration, maintenance and use of Internet domain names that are confusingly similar to SBM's marks, and by prominently featuring the confusingly similar GRAND MONACO CASINO and GRAND MONACO designations throughout their websites and gambling software in order to attract consumers to Defendants' websites and to create a caché that the sites would otherwise not possess. As Maxwell Wright— owner of the majority of domain names at issue in this action and Director and Chief Executive

---

[1]　Accordingly, SBM will continue to refer to Defendants' websites as the Grand Monaco Casino herein.

Officer of Defendant PlayShare — conceded in his submission to the World Intellectual Property Organization ("WIPO") in a related proceeding between SBM, Lucan Toh, and Maxwell Wright, Defendants are "seeking to get some of the lustre of Monaco by incorporating the word in our name."

5.      Plaintiff seeks damages and permanent injunctive relief for Defendants' acts of unfair competition, trademark infringement, trademark dilution, cybersquatting, and related claims under federal and New York statutory and common law to prevent Defendants' continued fostering of an injurious false identification and association between Defendants and SBM and further co-opting of the goodwill and reputation of SBM's famous and valuable trademark rights.

## THE PARTIES

6.      Plaintiff SBM is a société anonyme organized and existing under the laws of the Principauté of Monaco, enrolled with the registry of companies of Monaco under number 56 S 00523, with a principal place of business at Place du Casino, Monte Carlo MC 98000 Monaco, Principauté de Monaco.  SBM has an additional place of business, operated in conjunction with the Principauté de Monaco, located at 565 Fifth Avenue, New York, New York 10017.

7.      Upon information and belief, Defendant PlayShare PLC ("PlayShare") is a public limited company organized under the laws of the United Kingdom with its principal place of business at 7 Queen Street, Mayfair, London W1J 5PB, UK.  Upon information and belief, PlayShare is the parent company of GamShare (UK) Limited and Grand Monaco Limited.

8.      Upon information and belief, Defendant Grand Monaco Limited ("Grand Monaco") is a private limited company organized under the laws of the United Kingdom with its principal place of business at 7 Queen Street, Mayfair, London W1J 5PB, UK.  Upon information and belief, Grand Monaco is a subsidiary of PlayShare PLC.

4

9.      Upon information and belief, Defendant GamShare (UK) Limited ("GamShare") is a private limited company organized under the laws of the United Kingdom with its principal place of business at 7 Queen Street, Mayfair, London W1J 5PB, UK. Upon information and belief, GamShare is a gaming operator, licensed in Kahnawake, Canada. Upon information belief, GamShare is a subsidiary of PlayShare.

10.     Upon information and belief, Defendant Lucan Toh ("Toh") is a former Director of PlayShare and a resident of the United Arab Emirates. Toh is the registered owner of domain names through which Defendants operate the Grand Monaco Casino.

11.     Upon information and belief, Defendant Maxwell Wright ("Wright") is a Director and the Chief Executive Officer ("CEO") of PlayShare, and a resident of South Africa. Wright is the registered owner of domain names through which Defendants operate the Grand Monaco Casino.

12.     Upon information and belief, Defendant Hillstead Limited ("Hillstead") is a company organized under the laws of the United Kingdom with its principal place of business at Suite 2B, Centreplaza, Main Street, Gibraltar. Upon information and belief, Hillstead is a subsidiary of Grand Monaco that handles, at least in part, the financial transactions for the Grand Monaco Casino.

13.     Upon information and belief, through their ownership of domains names set forth *infra* in ¶ 33 and control over PlayShare, Toh and Wright have caused PlayShare to operate the Grand Monaco Casino. Upon information and belief, Toh and Wright have caused subsidiaries of PlayShare, including Grand Monaco, GamShare, and Hillstead to aid in the advertising and promotion of the Grand Monaco Casino.

## JURISDICTION AND VENUE

14.     Plaintiff brings this action for federal unfair competition in violation of Section

43(a) of the Trademark Act of 1946, as amended (the "Lanham Act"), 15 U.S.C. § 1125(a);

federal trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C.

§ 1114(1); federal cybersquatting under the Anticybersquatting Consumer Protection Act, 15

U.S.C. § 1125(d)(1); deceptive acts and practices in violation of Section 349(h) of the New York

General Business Law; false advertising in violation of Section 350-e(3) of the New York

General Business Law; injury to business reputation and trademark dilution in violation of

Section 360-*l* of the New York General Business Law; and trademark infringement and unfair

competition in violation of the common laws of the State of New York and of the several states

of the United States.

15.     This Court has original jurisdiction under 15 U.S.C. § 1121(a) and 28 U.S.C.

§§ 1331, 1338(a) and 1338(b).  This Court has supplemental jurisdiction over all other claims

asserted herein under 28 U.S.C. § 1367(a).

16.     This Court has personal jurisdiction over Defendants under New York Civil

Practice Law and Rules § 302 by virtue of their transacting business and/or contracting to supply

goods or services in the State of New York, their commission of tortious conduct as described

herein within the State of New York, and their commission of tortious conduct as described

herein outside the State of New York, causing injury to Plaintiff within the State of New York,

with the actual or reasonable expectation that said conduct will have consequences in the State of

New York, and Defendants' deriving substantial revenue from interstate commerce.

17.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and 1391(c).

## THE BUSINESS OF PLAINTIFF SBM

18.     The Principauté de Monaco ("Monaco") is a constitutional monarchy located on a small piece of land, smaller than the area of Central Park in New York City, which is divided into four quarters. The most well-known of these quarters is undoubtedly Monte Carlo. It is so well-known, in fact, that it is common for the public to use the terms Monaco and Monte Carlo interchangeably.

19.     Monaco is known worldwide for, among other things, SBM's five high quality casinos, including most prominently the Casino de Monte-Carlo—one of Monaco's most famous and enduring symbols. SBM's empire of casinos is a venerable and important body within the international gaming and resort industry. The esteem held for SBM's casinos is based on its worldwide reputation for excellence and quality, and the terms "Monaco" and "Monte Carlo," when used in connection with gaming services, embody a tremendous amount of goodwill that inures to SBM. Because of the correlation between Monaco and Monte Carlo in the public's mind and the fame of SBM's Monaco-based casinos, to the average American consumer use of either the CASINO DE MONTE-CARLO mark or CASINO DE MONACO mark triggers an association with SBM's famous casinos in Monaco.

20.     Since April 2, 1863, SBM has enjoyed a government-granted monopoly over the casino and gaming industries for the territory of Monaco, and is therefore the sole company that can organize games and gambling in Monaco. A true and correct copy of the Privilege des Jeux, renewed for the last time by the Ordonnace Souveraine no. 15-732 of March 13, 2003, is attached hereto as Exhibit A. As indicated in Exhibit A, SBM will retain the exclusive right to conduct casino gaming within Monaco until at least April 1, 2027.

21.    SBM is the owner of United States Trademark Registration No. 3,031,006, dated December 20, 2005, for the mark CASINO DE MONACO for use in connection with "providing casino services within a hotel environment." A true and correct copy of Registration No. 3,031,006 and a true and correct copy of a Partial Surrender and Amendment to Delete Services in Remaining Class filed on December 20, 2007, are attached hereto as Exhibit B. SBM is also the owner of Registration No. 02.23234 for the mark CASINO DE MONACO issued by the Monaco Trademark Office on September 30, 2002. A true and correct copy of Monaco Registration No. 02.23234, for use in connection with casino services, among other things, and a translation are attached hereto as Exhibit C.

22.    United States Trademark Application Serial No. 77/329,567 for the mark CASINO DE MONACO and United States Trademark Application Serial No. 77/329,593 for the mark CASINO DE MONTE-CARLO, both of which were filed by SBM on November 14, 2007, for casino services are currently pending in the United States Patent and Trademark Office.

23.    In addition to the aforementioned trademark registrations and applications, SBM also owns over one hundred fifty domain names incorporating its trademarks that it uses in connection with its gaming and casino-related goods and services, including, among others, <monaco-grand-casino.com>, <casinosdemonaco.com>, <livemonacocasino.com>, <monacogoldcasino.fr>, <monaco-casinos.com>, <monaco-casinos.net>, <monacobestcasino.com>, <casinosmonaco.com>, <casinomonacopoker.com>, <casinomontecarlo.com>, and <casino-monte-carlo.com>. SBM has previously enforced its trademark rights against infringing domain name registrants in United States federal courts. In addition, SBM has obtained numerous domain name transfers from infringing registrants.

24.     SBM actively and extensively advertises and promotes its Monaco-based casinos through various channels and media, including print and broadcast media, film and the Internet, and uses the terms "Monaco" and "Monte-Carlo" to identify its casino-related goods and services. Though worldwide in its scope, a significant amount of this promotion is aimed at North American consumers. Approximately twenty-five percent of SBM's multi-million dollar worldwide advertising and promotion budget is spent on marketing within the United States. Furthermore, for over twenty years, SBM has maintained an office in New York, which space it shares with the Monaco Government Tourism Office, for the purposes of promoting, selling stays at, and visits and services relating to, SBM's Monaco-based hotels and casinos.

25.     Through its New York and Monaco offices, SBM promotes its casinos in the United States by participating in trade shows, arranging for advertising through the print and broadcast media, charity partnerships and other charitable activity, direct mail and telephone marketing, and group and individual sales activity. Hundreds of brochures advertising SBM's Monaco-based casinos are mailed to clients throughout the United States from SBM's New York office every year. Plaintiff also publishes and distributes its English-language publication "Société," dedicated to tourism in Monaco and the resorts owned by SBM, throughout United States.

26.     This widespread marketing effort has reaped benefits. North Americans make up the single largest group of SBM clients. As of September 2000, twenty-two percent of SBM's customers were located in North America, followed by France and then Italy.

27.     In addition to SBM's advertising and marketing efforts, the media and general public have frequently used the CASINO DE MONACO and CASINO DE MONTE-CARLO marks in connection with SBM — and such use by the media and public inures exclusively to the

9

benefit of SBM. As a famed institution, the Casino de Monte-Carlo garners a significant amount of unsolicited attention from the media. Monaco and the Casino de Monte-Carlo are frequently the subjects of newspaper and magazine articles throughout the United States. In addition, numerous books have been written about Monaco and the Casino de Monte-Carlo. In the United States especially, for many years, and long before Defendants' activities complained of here, the Principauté of Monaco and the brands with which it is associated, including SBM's casino and hotel brands, have special resonance, because the famous and glamorous Hollywood actress Grace Kelly gave up her career to marry the Prince of Monaco and to become a princess and live in the royal castle there. In addition, many motion pictures have been filmed in, based on, or feature Monaco and the Casino de Monte-Carlo and distributed and aired in the United States, including, without limitation, "Foolish Wives" (1922), "Monte Carlo" (1930), "The Man Who Broke the Bank at Monte Carlo" (1935), "Charlie Chan at Monte Carlo" (1937), "Rebecca" (1940), "To Catch a Thief" (1955), "Kaleidoscope" (1966), "Never Say Never Again" (1983), "Dirty Rotten Scoundrels" (1988), and "GoldenEye" (1995).

28.    As a result of SBM's long participation and leadership in the international gaming and resort industry, extensive advertising, and media attention over the MONACO and MONTE-CARLO marks for casino-related services and products, SBM would be irreparably harmed if it lost control over the ability to prevent unauthorized gaming sites from using such identifications for casino-related products or services.

## DEFENDANTS' UNLAWFUL CONDUCT

29.    Upon information and belief, Defendants operate several companies that provide marketing services to the online gambling industry in the form of both internet-based and non-internet-based advertising. This advertising is aimed at directing consumers to their Grand

Monaco Casino websites, where consumers can download gambling software onto their computers and utilize online gambling services.

30.     Upon information and belief, PlayShare is the parent company of several online gambling companies, including Grand Monaco, PokerShare.com, and CasinoShare.com, as well as the PlayShare Affiliates Program and G3 Partner Limited ("G3"). Upon information and belief, PlayShare is licensed by the Kahnawake Gaming Commission, which regulates and controls gaming and gaming related activities conducted within and from the Mohawk Territory of Kahnawake, Canada, through its subsidiary, GamShare. Upon information and belief, Wright is the Director of PlayShare subsidiaries PokerShare.com and CasinoShare.com. Upon information and belief, the PlayShare Affiliates Program and G3 are programs through which member third-parties receive a monthly commission from PlayShare based on revenues earned from gamblers referred by the member to PlayShare.

31.     Upon information and belief, PlayShare acquired Naden, Inc., including the Grand Monaco Casino and the G3 affiliate program that promotes it, effective November 1, 2006. Upon information and belief, PlayShare acquired the domain names set forth *infra* in this Complaint from Wayne Smith, the registered owner of the domain names on behalf Mountain View Trust.

32.     Upon information and belief, the Grand Monaco Casino, as it existed before the commencement of the instant legal action, was launched in or around July 2006. According to Defendants' websites, the Grand Monaco Casino offers players 250 unique games and "innovative monthly promotions" in order to retain existing clientele and continually attract new players. Upon information and belief, Defendants have actively employed the GRAND MONACO CASINO and GRAND MONACO designations in their advertising and promotional

campaigns and have advertised their online casino services nationwide, including in New York and this judicial District.

33.    Defendants have also drawn consumer attention to their websites and casino services using a number of Monaco-related domain names. As part of that effort Defendants have registered, maintained, and used at least the following domain names:

grandmonaco.com
grandmonacocasino.com
casinograndmonaco.com
deutschesgrandmonaco.com
grandmonacoayda.com
grandmonacoayuda.com
grandmonacobingo.com
grand-monaco.com
grand-monaco-casino.com
grand-monaco-poker.com
grandmonacocasinoclub.com
grandmonacoclub.com
grandmonacocraps.com
grandmonacogames.com
grandmonacogaming.com
grandmonacohost.com
grandmonacohosts.com
grandmonacolottery.com
casinograndmonaco.org
grandmonacocasino.org
grandmonaco.org
grandmonacocasinoclub.org
grandmonacomillions.org
grandmonacopoker.org
grandmonacopokerclub.org
grandmonacoracebook.org
pokergrandmonaco.org
grandmonacostore.com
grandmonacosupport.com
grandmonacovideopoker.com
grandmonaco.net
casinograndmonaco.net
grandmonacobingo.net
grandmonacocasino.net

grandmonacocasinoclub.net
grandmonacogames.net
grandmonacogaming.net
grandmonacolottery.net
grandmonacomillions.net
grandmonacoplayersclub.net
grandmonacopoker.net
grandmonacopokerclub.net
grandmonacoracebook.net
grandmonacoskillgames.net
grandmonacolotto.com
grandmonacolounge.com
grandmonacomahjong.com
grandmonacomillions.com
grandmonaconews.com
grandmonacoonlinecasino.com
grandmonacoonlinegaming.com
grandmonacoonlinepoker.com
grandmonacopartners.com
grandmonacoplayersclub.com
grandmonacopoker.com
grandmonacopokerclub.com
grandmonacopromotions.com
grandmonacoracebook.com
grandmonacorewards.com
grandmonacoskillgames.com
grandmonacoslots.com
grandmonacosports.com
grandmonacosportsbook.com
grandmonacosports.net
grandmonacosportsbook.net
pokergrandmonaco.net
clubmonacocasino.net

clubmonacocasino.org
grandmanaco.com
grand-manaco.com
grandmanacocasino.com
grandmonaca.com
grand-monaca.com
grandmanacacasino.com
grandmonoco.com
grand-monoco.com
grandmonococasino.com
grand-monoco.com
grandmonococasino.com
manacocasino.com
monacobar.com
monacocasinoclub.com
monacocasinoclub.net
monacocasinoclub.org
monacoplayersclub.com
monacoplayersclub.net
monacopokerclub.net
monacopokerclub.org
monacoracebook.com
monacoracebook.net
monacoracebook.org
monacorackbook.com
monacorackbook.net
monacorackbook.org
monacoroom.com
monacosportsbook.com
monacosportsbook.net
monacosportsbook.org
pokergrandmonaco.com
grandmcasino.com

These domain names are collectively referred to herein as the "Monaco Domain Names."

34.    Each of the Monaco Domain Names is not owned by a corporate entity, but by either Defendant Toh or Wright *personally*.[2] This is no accident.  Upon information and belief, at all relevant times Defendants Toh and Wright have used numerous corporate entities, including but not limited to PlayShare, GamShare, Grand Monaco, CasinoShare.com, PokerShare.com, Hillstead, G3, and the PlayShare Affiliate Program, as their alter egos; have dominated and controlled the affairs of these corporations; and have employed these entities as their instrumentalities for the acts alleged herein.  Through their ownership of the Monaco Domain Names essential to Defendants' operation of the Grand Monaco Casino and personal involvement in the promotion and marketing of the Grand Monaco Casino in the United States, including New York and even within this judicial District, Toh and Wright direct, control, participate in, and are moving forces behind Defendants' infringing activities.

35.    Defendants use the Monaco Domain Names and—before the commencement of the instant legal action—the GRAND MONACO CASINO and GRAND MONACO designations, to draw attention to and market their online casino websites.  Before the commencement of the instant legal action, Defendants' websites, as well as their associated gaming components, prominently featured the GRAND MONACO CASINO and GRAND MONACO designations.  As shown below, these websites also prominently featured a stylized rendition of those marks, including a mock royal "crest," enhancing the false suggestion that the

---

[2]    The Whois information for grandmcasino.com lists both Wright and GamShare as the registrant and administrative contact.

designations are associated with Monaco and its royal family:





36.    Prior to the commencement of the instant legal action, Defendants' Grand

Monaco Casino was in operation and the Monaco Domain Names resolved to websites with

identical content, thereby creating numerous avenues through which consumers could access the

Grand Monaco Casino.[3]

---

[3]    Currently, the following Monaco Domain Names appear to have been parked: grand-monaco-poker.com; grandmonacopoker.org; grandmonacopokerclub.org; pokergrandmonaco.org; grandmonacopoker.net; grandmonacopokerclub.net; grandmonacoonlinepoker.com; grandmonacopoker.com; grandmonacopokerclub.com; pokergrandmonaco.net; grandmonacovideopoker.com; monacopokerclub.net; monacopokerclub.org; monacoroom.com; and grandmcasino.com.



On the home page of Defendants' Grand Monaco Casino website, pictured above as it existed prior to the commencement of the instant legal action, consumers are invited to download gambling software. At the top of each page of Defendants' websites, the GRAND MONACO designation, coupled with the "crest" indicia, is prominently displayed.

37.    Directly below the link to download the gambling software on the home page of Defendants' websites, pictured above as it existed prior to the commencement of the instant legal action, is an invitation to "PLAY INSTANT FLASH — NO DOWNLOAD REQUIRED." Upon clicking this link, the following screen is displayed:



As shown above, each of Defendants' "Instant Flash" games are offered in close proximity to the GRAND MONACO CASINO designation and stylized "crest."

38.    The program available for download on Defendants' websites, as it existed at the commencement of the instant legal action, prominently features the GRAND MONACO stylized designation at the top of each gaming page, as shown below:



39.    Upon information and belief, Defendants' websites, their associated downloadable casino program, and their "Instant Flash" gaming environment are accessible anywhere in the United States, including New York and this judicial District.

40.    Defendants have targeted consumers within this judicial District for promotional campaigns intended to draw attention to PlayShare and its subsidiaries (which includes Grand Monaco). For example, on or about May 26, 2006, Defendants organized and heavily publicized a "gas giveaway" promotion that was, according to a PokerShare.com press release, "designed to

17

help New Yorkers enjoy their Memorial Day Weekend without having to fret about the high price of gasoline." Defendants actively encouraged local radio personalities and media outlets to publicize the event, as well as their casino services, websites, and affiliate programs. The event was held in this judicial District, at the corner of Canal Street and the West Side Highway, and resulted in a ten-block traffic jam that was ultimately shut down by the New York Police Department. As part of the event, Defendants gave away over eight thousand gallons of gasoline to New York consumers, including consumers in this judicial District, all in an attempt to gain attention for their casino services, websites, and affiliate programs.

41.      Upon information and belief, Defendants' computer program continues to interact with pre-registered customers in the United States, including customers in New York and this judicial District. For example, prior to the commencement of the instant legal action, as indicated in the above image of Defendants' software (and as highlighted below), Defendants' websites and their promotional material continued to make reference to recent winnings paid in U.S. dollars to U.S. players:



42.      As a result of Defendants' use of the terms "Monaco" and "Casino" in connection with gambling services, consumers are likely to believe mistakenly that Defendants' websites are sponsored or authorized by or are affiliated with SBM. The fact that Defendants have

incorporated the term "Grand" does little to dispel the likelihood of consumer confusion and indeed serves only to increase the likelihood that consumers will mistakenly believe that SBM and the Principauté of Monaco is associated with the Grand Monaco Casino. At best, Defendants' use of the term "Grand" does nothing to distinguish between the GRAND MONACO CASINO and GRAND MONACO designations and the CASINO DE MONACO mark. Defendants' use of a royal "crest" design in connection with the GRAND MONACO designations compounds the confusion.

43.    Defendants are no doubt cognizant of the similarities between their domain names and designations and the CASINO DE MONACO mark, and it is by virtue of those similarities that Defendants' enterprise has earned substantial revenues. No doubt trying to have their cake and eat it too, Defendants included a statement situated at the very bottom of their websites' home pages—as they existed prior to the commencement of the instant legal action—that, in small font, reads: "Grand Monaco is in NO way associated with the Principality of Monaco, nor ANY of the land-based casino operations located in that jurisdiction. Grand Monaco is an independent operation." The statement, which neither as a matter of law nor of fact excuses Defendants' infringing activities, demonstrates Defendants' own recognition that consumers are likely to believe mistakenly that Defendants' websites were in some way sponsored or endorsed by, or affiliated with SBM.

44.    Defendants actively and aggressively advertise, promote, and market the gambling services offered in connection with the Grand Monaco Casino websites. One means through which Defendants promote their websites is "affiliate programs." Affiliates promote Defendants' services for a commission of revenues earned by Defendants for each individual gambling on Defendants' websites as a result of the affiliate's efforts. Upon information and

belief, Defendants currently employ approximately 463 affiliates to promote their services and websites and, prior to the commencement of the instant legal action, derived approximately 95% of their business from affiliate advertisements featuring the GRAND MONACO CASINO and GRAND MONACO designations.  Affiliates provide links to Defendants' websites in their advertisements, allowing consumers to reach Defendants' Grand Monaco Casino websites with the click of a button.

45.    Defendants' affiliates promote not only the Grand Monaco Casino, but other PlayShare gaming websites offering casino services, including PokerShare.com and CasinoShare.com.  For example, on its website home page as it existed prior to the commencement of the instant legal action, G3 advertises its association with Grand Monaco in close proximity to a discussion of its connection to and relationship with the CasinoShare and PokerShare sites, and offers hyperlinks to those websites, as seen below:

> **What's News...**
>
> The recent acquisition of G3 Partner by PlayShare Plc fits firmly within their vision to become one of the **top 5 gaming operators within two years**. The two programs will merge to become one by January 2007. The best aspects of each will be incorporated into one of the most dynamic and progressive progam platforms ever launched. Join PlayShare Affiliates today and have two further products to promote - CasinoShare and PokerShare .
>
> 
>
> **Grand Monaco** is the biggest and most experienced Microgaming casino on the internet. Grand Monaco has more games - over 300! Interactive and loose slots, super fast blackjack and the friendliest gaming environment supported in several languages - perfect for promoting to international markets.

By coupling the advertising and promotion of Defendants' other gambling websites with the Grand Monaco Casino, Defendants leverage the popularity of such sites to the Grand Monaco Casino.

46.    Defendants' Grand Monaco Casino—and their use of the GRAND MONACO and GRAND MONACO CASINO designations in connection therewith—is a global enterprise, targeting consumers throughout Europe, Canada, and other parts of the world, in addition to the United States. Defendants offer the Grand Monaco Casino in English, German, French, Spanish, and Italian and allow consumers to gamble with American dollars, Euros, Canadian dollars, and pounds. Recent winners at the Grand Monaco Casino—published by Defendants to entice consumers to gamble on their website at <grandmonaco.com/Winners.aspx>—reside all over the world, including the United States, Germany, France, the United Kingdom, Japan, Kuwait, Australia, Belgium, Switzerland, Greece, Austria, and Canada. In addition to the Monaco Domain Names, Defendants have registered domain names containing the term "Monaco," or variations thereof, for use in connection with their Grand Monaco Casino on the European Registry.

47.    Upon information and belief, Defendant PlayShare is a public company. Notwithstanding the same, PlayShare has only publicly filed financial statements for the period ending December 31, 2006—just two months after Defendants acquired the Grand Monaco Casino. However, Wright has allegedly confirmed that the amount of business generated by the Grand Monaco Casino is "very substantial" and sales were at least $120,000,000 per annum based on 2006 rates. Based upon this assertion of Wright, it is apparent that Defendants enjoy substantial revenues from the operation of the Grand Monaco Casino undoubtedly by virtue of a false association with SBM's famous casino brands.

48.     Wright has stated that, in using the Monaco Domain Names and GRAND
MONACO CASINO and GRAND MONACO designations, Defendants are "seeking to get some
of the lustre of Monaco by incorporating the word in our name."

49.     On March 21, 2007, SBM initiated a proceeding before WIPO pursuant to the
Uniform Domain Name Dispute Resolution Policy to obtain transfers of the Monaco Domain
Names from Toh and Wright.  A true and correct copy of the Complaint in that proceeding is
attached hereto as Exhibit D.  On June 11, 2007, SBM, Toh, and Wright received notification of
the WIPO Administrative Panel's decision, dated May 25, 2007, finding Defendants' Monaco
Domain Names confusingly similar to SBM's CASINO DE MONACO and CASINO DE
MONTE-CARLO trademarks and ordering the transfer of the Monaco Domain Names to SBM.
A true and correct copy of the WIPO Administrative Panel's decision is attached hereto as
Exhibit E.

50.     On or around August 14, 2007, after the commencement of the instant legal, and
obviously with a view toward continuing to mimic SBM's brand equity, Defendants pretended to
"rebrand" and "relaunch" the Grand Monaco Casino as the Grand Mondial Casino.

But, as demonstrated by the home page of the Grand Mondial Casino, all they did was change the letters "aco" to "dial:"



So as to prevent any chance that their "rebranded" websites will not continue to enjoy the goodwill and brand equity associated with SBM, Defendants explicitly alert consumers that "Grand Mondial is a casino that launched originally as Grand Monaco in July 2006."

51.     Defendants' presentation of the GRAND MONDIAL CASINO designation is virtually identical to their stylized renditions of the GRAND MONACO and GRAND MONACO CASINO designations, which were prominently featured on Defendants' websites prior to the commencement of the instant legal action. As shown below, the GRAND

MONDIAL CASINO designation incorporates a "crest" in the same fashion as the GRAND

MONACO designation:



Defendants have deliberately maintained the look of stylized renditions of the GRAND

MONACO and GRAND MONACO designations in order to retain the costumer base gained as a

result of their use of the GRAND MONACO identifier.

     52.     Defendants continue to use their Monaco Domain Names in connection with their

"rebranded" websites.  Consumers directed to the Grand Mondial Casino by Defendants'

Monaco Domain Names will associate Defendants' websites with SBM .  Moreover, only two of

the currently non-parked Monaco Domain Names set forth *supra* in ¶ 33 reroute users to

Defendants' casino, located at <grandmondial.com>.  The remaining 83 non-parked Monaco

Domain Names are displayed as the web address for Defendants' Grand Mondial Casino.  Thus,

consumers accessing the Grand Mondial Casino through one of these Monaco Domain Names

views Defendants' continued use of the term "Monaco" in connection with Defendants' online

casino throughout their gambling experience.  By using the Monaco Domain Names in

connection with their "rebranded" website, Defendants are able to retain the customer base

gained through their infringing use of the GRAND MONACO designation and attract new

customers based on their ongoing use of the term "Monaco" in connection with online casino

services.

53.    In addition to the Monaco Domain Names, Wright has registered at least 34 domain names to be used in connection with Defendants' Grand Mondial Casino websites:

| | |
|---|---|
| grandmondial.com | grandmundialcasino.com |
| grandmondialcasino.com | grandmundiale.com |
| grandmondial.net | grandmundialesupport.com |
| grandmondiale.com | grandmundialsupport.com |
| grandmondialcasino.net | granmondiale.com |
| grandmondial.mobi | granmondiale.mobi |
| grandmodialecasino.com | granmondialecasino.com |
| grandmondialcasino.mobi | granmondialecasino.mobi |
| grandmondiale.mobi | granmondialecasino.net |
| grandmondiale.net | granmondialesupport.com |
| grandmondialecasino.com | granmundial.mobi |
| grandmondialecasino.mobi | granmundialcasino.com |
| grandmondialecasino.net | granmundialcasino.mobi |
| grandmondialesupport.com | granmundialcasino.net |
| grandmondialgifts.com | granmundialsupport.com |
| grandmondialsupport.com | gmgaming.com |
| grandmundial.com | gmgamingltd.com |

These domain names are collectively referred to herein as the "Grand Mondial Domain Names."

54.    Upon information and belief, such actions were taken in bad faith with full knowledge of Plaintiff's ownership of, and Plaintiff's exclusive rights to use the CASINO DE MONACO mark, with the intent to deceive and mislead the public into believing that Defendants' websites, casino software, gaming pages, and affiliate programs are sponsored, licensed, or authorized by or affiliated, connected, or otherwise associated with SBM.

55.    Defendants' use of the Grand Monaco Casino websites and Monaco Domain Names is likely to cause consumer confusion or mistake or deceive consumers into thinking that Defendants' websites, casino software, gaming pages, and affiliate programs are authorized by, or affiliated, connected, or otherwise associated with SBM. Defendants intentionally, willfully, and in bad faith created this misimpression.

25

56.    Defendants' activities are likely to diminish and blur and/or tarnish the meaning of Plaintiff's famous CASINO DE MONACO mark, thereby diluting the distinctive quality of the mark.

57.    Defendants' activities have caused and will continue to cause Plaintiff great and irreparable harm and damage.  Unless permanently restrained and enjoined by this Court, Defendants will persist in its unlawful activities, thereby causing further damage and irreparable harm to Plaintiff and to the public interest.

58.    Plaintiff has no adequate remedy at law.

## COUNT I — FEDERAL UNFAIR COMPETITION

59.    Plaintiff hereby realleges and incorporates by reference the allegations of paragraphs 1 through 58 of this Second Amended Complaint.

60.    The aforesaid acts of Defendants constitute use in commerce of words, terms, names, symbols, and devices, and combinations thereof; false designations of origin; false and misleading descriptions of fact; and false and misleading representations of fact that is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants with Plaintiff, or as to the origin, sponsorship, or approval of Defendants' services, goods, or other commercial activities by Plaintiff.

61.    The aforesaid acts of Defendants constitute use in commerce of words, terms, names, symbols, and devices, and combinations thereof; false designations of origin; false and misleading descriptions of fact; and false and misleading representations of fact in commercial advertising, or promotion that misrepresents the nature, characteristics, or qualities of Defendants' services, goods, or other commercial activities.

62.    The aforesaid acts of Defendants constitute false designation of origin and false

and misleading descriptions and representations in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

63.     The aforesaid acts of Defendants have caused, and are causing, great and irreparable harm to Plaintiff, and unless permanently restrained by this Court, said irreparable injury will continue.

## COUNT II —FEDERAL TRADEMARK INFRINGEMENT

64.     Plaintiff hereby realleges and incorporates by reference the allegations of paragraphs 1 through 63 of this Second Amended Complaint.

65.     Defendants, without the consent of Plaintiff, have used and will continue to use in commerce marks confusingly similar to SBM's registered CASINO DE MONACO trademark in connection with the sale, offering for sale, distribution and advertising of goods and/or services with which such intended use is likely to cause confusion, or to cause mistake, or to deceive.

66.     The aforesaid acts of Defendants constitute trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

67.     The aforesaid acts of Defendants have been intentional, willful, and in bad faith.

68.     The aforesaid acts of Defendants have caused, and are causing, great and irreparable harm to Plaintiff and, unless permanently restrained by this Court, said irreparable injury will continue.

## COUNT III — FEDERAL CYBERSQUATTING

69.     Plaintiff hereby realleges and incorporates by reference the allegations of paragraphs 1 through 68 of this Second Amended Complaint.

70.     The aforesaid acts of Defendants constitute the registration, maintenance and use of numerous domain names (the Monaco Domain Names) that are virtually identical to,

confusingly similar to, and dilutive of SBM's famous CASINO DE MONACO mark, knowingly and with a bad-faith intent to profit therefrom.

71.    The aforesaid acts of Defendants constitute unlawful cybersquatting in violation of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(1).

72.    The aforesaid acts of Defendants have caused, and are causing, great and irreparable harm to Plaintiff, and unless permanently restrained by this Court, said irreparable injury will continue.

### COUNT IV — DECEPTIVE ACTS AND PRACTICES UNDER NEW YORK LAW

73.    Plaintiff hereby realleges and incorporates by reference the allegations of paragraphs 1 through 72 of this Second Amended Complaint.

74.    The aforesaid acts of Defendants constitute deceptive acts or practices in the conduct of business, trade, or commerce, or in the furnishing of any service in New York State in violation of Section 349(h) of the New York General Business Law.

75.    The aforesaid acts of Defendants have caused, and are causing, great and irreparable harm to Plaintiff, and unless permanently restrained by this Court, said irreparable injury will continue.

### COUNT V — FALSE ADVERTISING UNDER NEW YORK LAW

76.    Plaintiff hereby realleges and incorporates by reference the allegations of paragraphs 1 through 75 of this Second Amended Complaint.

77.    Defendants misleadingly advertised services, in that Defendants made statements, used words, designs, devices, sounds, or combinations thereof that failed to reveal facts material in the light of such representations with respect to the subject service, or under such conditions as are customary or usual.

78.    The aforesaid acts of Defendants constitute false advertising in the conduct of business, trade, or commerce, or in the furnishing of any service in New York State in violation of Section 350-e(3) of the New York General Business Law.

79.    The aforesaid acts of Defendants have caused, and are causing, great and irreparable harm to Plaintiff, and unless permanently restrained by this Court, said irreparable injury will continue.

## COUNT VI — INJURY TO BUSINESS REPUTATION AND DILUTION UNDER NEW YORK LAW

80.    Plaintiff hereby realleges and incorporates by reference the allegations of paragraphs 1 through 79 of this Second Amended Complaint.

81.    The aforesaid acts of Defendants constitute intended use beginning after the CASINO DE MONACO mark had become famous and will dilute the distinctive quality of the CASINO DE MONACO mark.

82.    The aforesaid acts of Defendants are likely to injure the business reputation of Plaintiff and to dilute the distinctive quality of Plaintiff's trademarks in violation of 360-*l* of the New York General Business Law.

83.    The aforesaid acts of Defendants have caused, and are causing, great and irreparable harm to Plaintiff, and unless permanently restrained by this Court, said irreparable injury will continue.

## COUNT VII — COMMON LAW TRADEMARK INFRINGEMENT

84.    Plaintiff hereby realleges and incorporates by reference the allegations of paragraphs 1 through 83 of this Second Amended Complaint.

85.    The aforesaid acts of Defendants constitute use that is likely to cause confusion as to the source of Defendants' goods and/or services.

86.    The aforesaid acts of Defendants constitute trademark infringement in violation of common law.

87.    The aforesaid acts of Defendants have caused, and are causing, great and irreparable harm to Plaintiff, and unless permanently restrained by this Court, said irreparable injury will continue.

### COUNT VIII — COMMON LAW UNFAIR COMPETITION

88.    Plaintiff hereby realleges and incorporates by reference the allegations of paragraphs 1 through 87 of this Second Amended Complaint.

89.    The aforesaid acts of Defendants constitute use that is likely to cause confusion as to the source of Defendants' goods and/or services.

90.    The aforesaid acts of Defendants constitute unfair competition in violation of common law.

91.    The aforesaid acts of Defendants have caused, and are causing, great and irreparable harm to Plaintiff, and unless permanently restrained by this Court, said irreparable injury will continue.

### RELIEF REQUESTED

WHEREFORE, Plaintiff prays for a judgment in its favor and against Defendants ordering:

a.    That Defendants, and each of its officers, directors, agents, servants, employees and representatives, and those persons in active concert or participation with them or any of them, be permanently enjoined and restrained from:

(1)    Using on or in connection with the promotion, advertisement, marketing, offering, operation or in any manner using gaming or gambling services, online or on land, including as a domain name or a component thereof, the designations GRAND

30

MONACO, GRAND MONACO CASINO, GRAND MONDIAL, and GRAND MONDIAL CASINO, or any colorable imitations thereof or anything confusingly similar thereto; or the CASINO DE MONACO mark, or any colorable imitations thereof or anything confusingly similar thereto;

(2)    Representing by any means whatsoever, directly or indirectly, or doing any other acts or things calculated or likely to cause confusion, mistake, or to deceive consumers into believing that Defendants' goods and/or services are the services or products of Plaintiff, or that there is any affiliation or connection between Plaintiff or its services and goods and Defendants or their services and products and from otherwise unfairly competing with Plaintiff;

(3)    Registering, using or transferring the Monaco Domain Names and the Grand Mondial Domain Names and from registering, using, copying, reproducing or imitating the CASINO DE MONACO mark, or any colorable imitations thereof or anything confusingly similar thereto;

(4)    Using any mark in a manner so as to cause the dilution of the distinctive quality of the famous CASINO DE MONACO mark;

(5)    Using any designation incorporating the designation MONACO or MONTE CARLO for casino-related products or services.

b.    That Defendants be directed to file with this Court and to serve upon Plaintiff within thirty (30) days after service upon Defendants of this Court's injunction issued in this action, a written report by Defendants under oath setting forth in detail the manner in which Defendants has complied with this injunction.

c.    That Defendants order the Monaco Domain Names and Grand Mondial Domain

Names to be transferred to Plaintiff.

    d.     That Plaintiff recover its damages sustained as a result of Defendants' federal trademark infringement, unfair competition, and cybersquatting, together with an accounting of Defendants' profits arising from such activities, and that the Court exercise its discretion and enter a judgment for such additional sums as the Court shall find to be just, according to the egregious nature of the acts of Defendants.

    e.     That Plaintiff have and recover treble damages under 15 U.S.C. § 1117 by reason of the willful and deliberate acts of federal trademark infringement by Defendants.

    f.     That Plaintiff have and recover treble damages under New York General Business Law §§ 349(h) and 350-d by reason of Defendants' acts of deceptive trade practices.

    g.     That Plaintiff have and recover its reasonable attorneys' fees pursuant to 15 U.S.C. § 1117 and New York General Business Law §§ 349(h) and 350-d.

    h.     That Plaintiff have and recover Defendants' profits and/or damages by reason of Defendants' acts of trademark infringement and unfair competition under common law.

    i.     That Defendants be required to recall from any and all channels of trade any and all advertising or promotional materials or other infringing matter, and to take affirmative steps to dispel any false suggestion of a connection to Plaintiff by virtue of its infringing activities, including, but not limited to, all necessary and appropriate corrective advertising measures.

    j.     That Plaintiff have and recover its taxable costs and disbursements herein.

    k.     That Plaintiff have such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a jury trial on

all issues triable to a jury.


DATED:    New York, New York
          February 8, 2008

                         QUINN EMANUEL URQUHART OLIVER &
                         HEDGES, LLP


                         By: _____
                             Robert L. Raskopf (RR-5022)
                             Lori E. Weiss (LW-7866)

                         51 Madison Avenue, 22nd Floor
                         New York, New York  10010
                         Tel:  (212) 849-7000
                         Fax:  (212) 849-7100

                         ATTORNEYS FOR SOCIETE DES BAINS
                         DE MER ET DU CERCLE DES
                         ETRANGERS A MONACO

                         *Of Counsel*:

                         QUINN EMANUEL URQUHART OLIVER
                         & HEDGES, LLP
                         George R. Hedges
                         865 S. Figueroa Street, 10th Floor
                         Los Angeles, California 90017
                         Tel:  (213) 443-3000
                         Fax:  (213) 443-3100